Ftjld, J.
The by-laws of defendant corporation give it an option to purchase, in case of the death of a stockholder, his shares of the corporate stock. The enforcibility of this option is one of the questions for decision.
Biltmore Tissue Corporation was organized under the Stock Corporation Law in 1932, with an authorized capitalization of 1,000 shares without par value, to manufacture and deal in paper and paper products. The by-laws, adopted by the incorporators-directors, contain provisions limiting the number of shares (originally 5, later 20) available to each stockholder (§ 28) and restricting stock transfers both during the life of the stockholder and in case of his death (§§ 29, 30). Whenever a stockholder desires to sell or transfer his shares, he must, according to one by-law (§ 29), give the corporation or other stockholders ‘ ‘ an opportunity to repurchase the stock at the price that was paid for the same to the Corporation at the time the Corporation issued the stock”; if, however, the option is not exercised, “ then, after the lapse of sixty days, the stock may be sold by the holder to such person and under such circumstances as he sees fit.” The by-law, dealing with the transfer of stock upon the death of a stockholder (§ 30) — the provision with which we are here concerned — is almost identical, It *538 recites that the corporation is to have the right to purchase its late stockholder’s shares for the price it originally received for them:
“ Stock Transfer in Case of Death. In case of the death of any stockholder, the Corporation shall have the right to purchase the stock from the legal representative of the deceased for the same price that the Corporation received therefor originally. If the Corporation does not, or cannot, purchase such stock, the Board of Directors shall have the right to empower such of its existing stockholders as it sees fit to make such purchase from such legal representative at the same price. Should the option provided for in this section not he exercised, then, after the lapse of ninety days, the legal representative may dispose of said stock as he sees fit.”
Harry Kaplan, a paper jobber, was one of Biltmore’s customers and some months after its incorporation purchased 5 shares of stock from the corporation at $5 a share. In 1936, Kaplan received a stock dividend of 5 more shares, and two years later purchased an additional 10 shares for $100. On the face of each of the three certificates, running vertically along the left-hand margin, appeared the legend,
‘ ‘ Issued subject to restrictions in sections 28, 29, and 30 of the By-laws.” ■
On October 20, 1953, Kaplan wrote to the corporation stating that he was “ interested in selling ” his 20 shares of stock and requesting that he be given the “ price ” which the board of directors ‘ ‘ will consider, so that I may come to a decision. ’ ’ He died five days later. Some months thereafter, in February, 1954, his son, who was also one of his executors, addressed a letter to Biltmore, inquiring whether it was ‘ ‘ still interested in acquiring shares and at what price.” By another letter, dated the same day, the attorney for the executors sent to the corporation the three stock certificates, representing the 20 shares, and requested that a new certificate be issued in the name of the estate or the executors. Within 30 days, on March 4, 1954, Biltmore’s board of directors voted to exercise its option to purchase the stock, pursuant to section 30 of the by-laws, and about three weeks later the executors’ attorney was advised of the corporation’s action. He was also informed that, although the by-law provision permitted purchase at “ the same price that the *539 company received therefor from the stockholder originally,” the corporation had, nevertheless, decided to pay $20 a share, “ considerably more than the original purchase price ”, based on the prices at which it had acquired shares from other stockholders.
Kaplan’s executors declined to sell to the corporation, insisting that the stock which had been in the decedent’s name be transferred to them. When their demand was refused, they brought this action to compel Biltmore to accept surrender of the decedent’s stock certificate and to issue a new certificate for 20 shares to them. They contended, and the contentions are repeated on this appeal, that the legend on the certificate fails to meet the requirement of section 176 of the Personal Property Law that a restriction on transfer be “ stated upon the certificate ” and that the by-law is void as an unreasonable restraint. The corporation interposed a counterclaim for specific performance based on the exercise of its option to purchase the shares under by-law section 30. The court at Special Term granted judgment to the corporation on its counterclaim and dismissed the complaint. The Appellate Division reversed, rendered judgment directing the transfer of the stock to the plaintiffs and dismissed the defendant’s counterclaim upon the ground that the by-law in question is void.
Section 176 of the Personal Property Law, which is identical with section 15 of the Uniform Stock Transfer Act, provides that “ there shall be no restriction upon the transfer of shares ” represented by a stock certificate “ by virtue of any by-law of such corporation, or otherwise, unless the # * * restriction is stated upon the certificate.” (Emphasis supplied.) In order to comply with this statutory mandate, the corporation printed the words, “ Issued subject to restrictions in sections 28, 29, and 30 of the By-laws,” on the side of the certificate. The plaintiffs maintain that this is not a proper “ statement,” that the restriction must be set out verbatim or in substance. There is no such prescription in the statute, and the courts have found noncomplianee only where the stock certificate gives no notice whatever of the restriction sought to be enforced. (See, e.g., Peets v. Manhasset Civil Engineers, 4 Misc 2d 683; Security Life & Acc. Ins. Co. v. Carlovitz, 251 Ala. 508, 512-513; Costello v. Farrell, 234 Minn. 453, 465; Magnetic Mfg. Co. v. Manegold, 201 Wis. 154, 157.) The word “ stated” sanctions a notation *540 indicating where the restriction appears and permits incorporation by adequate reference. In other words, a restriction is sufficiently “ stated ” by a legend noting that the stock is “issued subject to restriction” and specifying where its full text may be found. (See, e.g., Bloomingdale v. Bloomingdale, 107 Misc. 646, 649-650; Weissman v. Lincoln Corp. [Fla.], 76 So. 2d 478, 483-484 [with the result of which, though not its reasoning, we agree]; Longyear v. Hardman, 219 Mass. 405, 407; see, also, Penthouse Properties v. 1158 Fifth Ave., 256 App. Div. 685, 688-689; 12 Fletcher’s Cyclopedia Corporations [Perm, ed., 1932], § 5479, p. 277. )[1] In this connection, it is significant that, where the legislature wished the words of a restriction or its substance to be actually printed on the certificate, it used language to express that thought. Thus, section 66 of the Stock Corporation Law recites that, “ If a stockholder shall be indebted to the corporation, the directors may refuse to consent to a transfer of his stock until such indebtedness is paid, provided a copy of this section or the substance thereof is written or printed upon the certificate of stock.” (Emphasis supplied.)
Since, then, the legend on the certificate meets the statute’s requirements, we turn to the validity of the by-law restriction.
The validity of qualifications on the ownership of corporate shares through restrictions on the right to transfer has long been a source of confusion in the law. The difficulties arise primarily from the clash between the concept of the shares as “ creatures of the company’s constitution and therefore * * * essentially contractual choses in action ” (Gower, Some Contrasts between British and American Corporation Law, 69 Harv. L. Rev. 1369, 1377) and the concept of the shares as personal property represented so far as possible by the certificate itself and, therefore, subject to the time-honored rule that there be no unreasonable restraint upon alienation. While the courts of this *541 state and of many other jurisdictions, as opposed to those of England and of Massachusetts (Gower, supra, 69 Harv. L. Rev. 1369, 1377-1378; O’Neal, Restrictions on Transfer of Stock in Closely Held Corporations, 65 Harv. L. Rev. 773, 778), have favored the “ property ” concept (see O’Neal, supra, 65 Harv. L. Rev. 773, 779), the tendency is, as section 176 of the Personal Property Law implies, to sustain a restriction imposed on the transfer of stock if ‘ ‘ reasonable ’ ’ and if the stockholder acquired such stock with requisite notice of the restriction.
The question posed, therefore, is whether the provision, according the corporation a right or first option to purchase the stock at the price which it originally received for it, amounts to an unreasonable restraint. In our judgment, it does not.
The courts have almost uniformly held valid and enforcible the first option provision, in charter or by-law, whereby a shareholder desirous of selling his stock is required to afford the corporation, his fellow stockholders or both an opportunity to buy it before he is free to offer it to outsiders. (See, e.g., Penthouse Properties v. 1158 Fifth Ave., supra, 256 App. Div. 685; Hassel v. Pohle, 214 App. Div. 654; Cowles v. Cowles Realty Co., 201 App. Div. 460; Palmer v. Chamberlin, 191 F. 2d 532; Doss v. Yingling, 95 Ind. App. 494; Baumohl v. Goldstein, 95 N. J. Eq. 597; see, also, 8 Fletcher, op. cit., § 4205, p. 787.) The courts have often said that this first option provision is “ in the nature of a contract ” between the corporation and its stockholders and, as such, binding upon them. (Hassel v. Pohle, supra, 214 App. Div. 654, 658; see, also 8 Fletcher, op. cit., § 4194, p. 736.) In Doss v. Yingling (supra, 95 Ind. App. 494), a leading case on the subject and one frequently cited throughout the country, a by-law provision against transfer by any stockholder — there were three — of any shares until they had first been offered for sale to other stockholders at book value, was sustained as reasonable and valid (p. 500): “ The weight of authority is to the effect that a corporate by-law which requires the owner of the stock to give the other stockholders of the corporation * * * an option to purchase the same at an agreed price or the then-existing book value before offering the stock for sale to an outsider, is a valid and reasonable restriction and binding upon the stockholders.’ ’ (Emphasis supplied.) And in the Penthouse Properties case (supra, 256 App. Div. 685, 690-691), the court declared that “ The general *542 rule that ownership of property cannot exist in one person and the right of alienation in another * * * has in this State been frequently applied to shares of corporate stock # * # and cognizance has been taken of the principle that ‘ the right of transfer is a right of property, and if another has the arbitrary power to forbid a transfer of property by the owner that amounts to annihilation of property.’ * * * But restrictions against the sale of shares of stock, unless other stockholders or the corporation have first been accorded an opportunity to buy, are not repugnant to that principle. # * * The weight of authority elsewhere is to the same effect.”[2]
As the cases thus make clear, what the law condemns is, not a restriction on transfer, a provision merely postponing sale during the option period, but an effective prohibition against transferability itself. Accordingly, if the by-law under consideration were to he construed as rendering the sale of the stock impossible to anyone except to the corporation at whatever price it wished to pay, we would, of course, strike it down as illegal. But that is not the meaning of the provision before us. The corporation had its option only for a 90-day period. If it did not exercise its privilege within that time, the deceased stockholder’s legal representative was at liberty to “ dispose of said stock as he [saw] fit ” (§ 30), and, once so disposed of, it would thereafter be free of the restriction. In a very real sense, therefore, the primary purpose of the by-laws was to enable a particular party, the corporation, to buy the shares, not to prevent the other party, the stockholder, from selling them. (See 3 Simes & Smith on Law of Future Interests [2d ed., 1956], § 1154, p. 61.)
The Appellate Division, however, was impressed with what it deemed the “unreasonableness,” that is, “unfairness,” of the price specified in the by-law, namely, a price at which the shares had originally been purchased from the corporation. Carried to its logical conclusion, such a rationale would permit, indeed, would encourage, expensive litigation in every case where the price specified in the restriction, or the formula for fixing the price, was other than a recognized and easily ascer *543 tamable fair market value. This would destroy part of the social utility of the first option type of restriction which, when imposed, is intended to operate in futuro and must, therefore, include some formula for future determination of the option price.
Generally speaking, these restrictions are employed by the so-called “ close corporation ” as part of the attempt to equate the corporate structure to a partnership by giving the original stockholders a sort of pre-emptive right through which they may, if they choose, veto the admission of a new participant. (See Bloomingdale v. Bloomingdale, supra, 107 Misc. 646, 651-652; Model Clothing House v. Dickinson, 146 Minn. 367, 370-371; see, also, Israels, The Close Corporation and the Law, 33 Corn. L. Q. 488, 492-493.) Obviously, the case whore there is an easily ascertainable market value for the shares of a closely held corporate enterprise is the exception, not the rule, and, consequently, various methods or formulae for fixing the option price are employed in practice — e.g., book or appraisal value, often exclusive of good will (see, e.g., Lawson v. Household Finance Corp., 17 Del. Ch. 343, affg. 17 Del. Oh. 1; Doss v. Yingling, supra, 95 Ind. App. 494), or a fixed price (Scruggs v. Cotterill, 67 App. Div. 583) or the par value of the stock. (See, e.g., Boston Safe Dep. & Tr. Co. v. North Attleborough Chapt. of American Red Cross, 330 Mass. 114; Chaffee v. Farmers’ Co-Op. Elevator Co., 39 N. D. 585, 590; O’Neal, supra, 65 Harv. L. Rev. 773, 798 et seq.)[3]
In sum, then, the validity of the restriction on transfer does not rest on any abstract notion of intrinsic fairness of price. To be invalid, more than mere disparity between option price and current value of the stock must be shown. (See Palmer v. Chamberlin, supra, 191 F. 2d 532, 541.) Since the parties have in effect agreed on a price formula which suited them, and provision is made freeing the stock for outside sale should the corporation not make, or provide for, the purchase, the restriction is reasonable and valid.
The further argument made by the plaintiffs, that the defendant corporation, in any event, waived its right by failing to exercise its option within the prescribed 90 days, cannot avail them. Section 30 of the by-laws provides that the corporation *544 has the right ‘‘ to purchase the stock from the legal representative of the deceased ’ ’ and that, if the option is not exercised, “ then, after the lapse of ninety days, the legal representative may dispose of said stock as he sees fit.” The section is patently deficient in omitting to specify the date upon which the 90-day period is to commence. It cannot mean the date of death (here it was October 25, 1953) or even the^ date on which the corporation learned of the death (shortly thereafter), for, until letters testamentary or letters of administration are issued, the ‘ ‘ legal representative ” of the deceased is not ascertainable and there is no one from whom the corporation could purchase the stock. (Cf. Motyka v. City of Oswego, 309 N. Y. 881.) In the present case, letters testamentary were issued to the plaintiffs on December 17, 1953, but the corporation was not informed of this until February 10,1954. Consequently, since the corporation’s board of directors voted on March 4 to purchase the shares and apprised counsel for the plaintiffs, the legal representatives of the deceased stockholder, of their desire to do so on March 23, the option was clearly exercised within the permitted period.
The judgment of the Appellate Division dismissing the defendant’s counterclaim and sustaining the plaintiff’s complaint should be reversed, and that of Special Term reinstated, with costs in this court and in the Appellate Division.
Conway, Ch. J., Desmond, Dye, Froessel, Yan Yoorhis and Burke, JJ., concur.
Judgment of Appellate Division reversed and that of Special Term reinstated, with costs in this court and in the Appellate Division.

. The section of the proposed Uniform Commercial Code drafted by the American Law Institute and the Commissioners on Uniform State Laws which is analogous to section 176 of the Personal Property Law provides (Official Draft, 1952, § 8-204, p. 637) : “A restriction on transfer imposed by the issuer even though otherwise lawful is ineffective unless noted conspicuously on the security.” (Emphasis supplied.) The draftsmen have stated that the section was not designed to change “prevailing case law” (Comment, p. 638), and the word “noted” certainly does not import a requirement that the restriction itself or its substance be set forth in full on the certificate.

. The court went further in the Penthouse Properties case than we are called upon to go here; in view of the special purposes of a corporation owning a co-operative apartment house, it sustained a restriction actually requiring the “consent” of the directors to a proposed transfer (256 App. Div. 685, 689). The present ease involves no such “consent” restriction.

. Tn the case of no-par shares, it should be noted, the figure usually most comparable to par value is issue price.