Edward A. MARTIN, Plaintiff-Appellant,

v.

GRAYBAR ELECTRIC COMPANY, Inc., Defendant-Appellee.

No. 13043.

United States Court of Appeals Seventh Circuit.

Jan. 5, 1961.

Rehearing Denied Feb. 7, 1961.

See also 266 F.2d 202.

Harry H. Ruskin, Joseph Rosenbaum, Chicago, Ill., for appellant.

Walter J. Cummings, Jr., Chicago, Ill., Edward J. Ross, Stuart H. Johnson, Jr., New York City, William M. McGovern, Jr., Chicago, Ill. (Sidley, Austin, Bur-

gess & Smith, Chicago, Ill., of counsel), for appellee.

Before HASTINGS, Chief Judge, and KNOCH and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This appeal is from a judgment of the District Court, entered February 25, 1960, (1) dismissing plaintiff's action seeking to recover declared but unpaid dividends on his 297 shares of preferred stock and 610 shares of common stock, after June 30, 1953, and to obtain issuance to plaintiff of a common stock certificate for his 610 common shares represented by Voting Trust Certificates under an expired Voting Trust; and (2) granting defendant's counterclaim for declaratory judgment that defendant had exercised an option to purchase all of plaintiff's stock following his resignation on June 30, 1953, as an employee of defendant, and for specific performance.

The Court made detailed findings of fact relative to defendant's option right which was made a condition to plaintiff's purchase of defendant's stock. There is little if any dispute regarding such findings other than on the issue as to whether defendant properly exercised its option, subsequently discussed.

A summary of the findings, together with undisputed evidence offered by defendant, will suffice. Defendant (referred to as Graybar) has been owned exclusively by its active employees and pensioners since January 1, 1929, when its employees purchased all its common stock from a subsidiary of Western Electric Company, Inc. (referred to as Western Electric). The sale was accomplished by organizing a holding corporation, Graybar Management Corporation (referred to as Graybar Management), to purchase all of defendant's common stock. The employees subscribed for the common stock of Graybar Management. On December 30, 1939, Graybar Management and defendant were consolidated into Graybar. Graybar's employees thereby became its direct owners and Graybar Management ceased to exist.

Such employee-ownership was vital to defendant's existence and essential to its prosperity. It enabled defendant to attract high caliber personnel, inspired great loyalty and industry, encouraged long tenure of service and improved customer relations. Defendant prospered under this relationship, reaching annual sales of over $490,000,000, and a net income after taxes of over $10,000,000.

Any employee, including plaintiff, who became a stockholder was able not only to obtain numerous employee benefits but substantial rewards from his stock ownership. Thus, plaintiff, with an investment of only $6,800 in defendant's stock received $19,537.65 in cash dividends, plus stock for which he can now receive an additional $11,340, at the option price, or a total return of over $30,000 on his $6,800 investment.

Stock was purchasable only by employees, with an express condition granting defendant an option to repurchase on death, sale to a third party or cessation of employment other than by retirement on a pension. The Court expressly found, "The option was essential to the maintenance of Graybar as a corporation owned only by its active and retired employees." Graybar always exercised its option when an employee resigned or died, which prevented ownership of stock by non-employees. Through September 1958, 2,403 employees and the estates of employees and pensioners honored the options and sold Graybar a total of 275,873 shares. Plaintiff is the first and only stockholder in thirty years to repudiate the option.

Plaintiff was an employee from 1925 until June 30, 1953, when he voluntarily resigned. At that time he owned 297 shares of preferred and 610 shares of common stock. The latter was represented by Voting Trust Certificates under a 10-year Voting Trust dated January 15, 1948. The preferred stock was not in a Voting Trust but was held by plaintiff directly.

Of such 610 shares of common stock, plaintiff subscribed for 340 shares in various stock purchase plans at $20.00

a share. The remaining 270 shares and the 297 shares of preferred stock were issued as stock dividends. By reason of such stock dividends, plaintiff's average purchase price for all of his stock was about $7.50 a share. All of the stock was worth more than $20.00 a share at the time it was acquired by plaintiff; some of it had a value greatly in excess of that amount. Plaintiff as well as other employees could purchase at this low price because of the option which was expressly related thereto. Each employee, including plaintiff, at the time of the purchase of stock, common or preferred, granted defendant an option to purchase his stock at $20.00 a share, on cessation of employment.

Plaintiff's obligation relative to the option granted by him to Graybar is evidenced by numerous instruments. It was contained in the Certificate of Incorporation of Graybar Management, dated November 2, 1928, and was included in Graybar's charter consisting of the Certificate of Consolidation, dated December 30, 1939, as amended by the "Certificate of Increase in Number and Classification of Shares," dated December 10, 1947.

Graybar's charter among other things provided:

> "(c) In the event that any holder of Common Stock ceases to be an employee of the corporation, * * * for any cause other than death or retirement on a pension allowed by the corporation * *, the corporation is hereby given an option to purchase all the Common Stock held by such stockholder at the price provided in paragraph (a) of this Section B."

The charter contained a similar option provision relative to preferred stock. The option price was "the price for which said shares were issued by the corporation," or $20.00 a share, plus accumulated dividends. Plaintiff signed numerous subscription agreements covering all of his purchase of stock. The agreement signed November 10, 1950 is typical. Plaintiff thereby subscribed for stock on the terms and conditions contained in the Stock Purchase Plan, and specifically agreed, "for the privilege of subscribing for such shares of stock at the said price," he would be bound by all the provisions of the plan and, in particular, defendant's option to repurchase his stock "in the event of the termination of my employment by the company other than by retirement on a pension."

The Stock Purchase Plan of October 1, 1950, to which plaintiff specifically agreed to be bound, commenced with a reaffirmation of the fact that "the company is 100% owned by its active and retired employees," and expressly provided that the subscriber agreed to the charter provisions granting defendant the purchase option "in the event any holder of stock shall desire to sell, transfer or otherwise dispose of any of his shares of such stock, or in the event of his death or the termination of his employment other than by retirement on a pension." All other stock purchase plans containing the option were agreed to by plaintiff.

By agreement of all parties, common stock purchased by defendant's employees, including plaintiff, was placed in a Voting Trust and Voting Trust Certificates issued to shareholders. Each certificate stated in bold faced and large print that it was subject to "certain options to the corporation to purchase the shares represented thereby." Thus, each time plaintiff accepted a Voting Trust Certificate he again consented to the option. Each stock certificate for plaintiff's 297 shares of preferred stock issued directly to him also contained on its face the option agreement, printed in large, bold faced letters, and on the back, the option provision as contained in the corporate charter.

Plaintiff, both on deposition and at the trial, testified in detail relative to the plan by which Graybar permitted its employees to purchase stock, and particularly the option provision. In the interest of brevity, we adopt a statement from Graybar's brief as to plaintiff's admissions: "Defendant is a corporation wholly owned by its active and retired employees, called pensioners; plaintiff, a former employee of defendant, acquired

his stock over a 25-year period either by purchase or as stock dividends; each time he acquired stock he voluntarily granted defendant the option to purchase his stock if he ceased to be an employee; the first option was granted in 1928 and the last in 1950; the option was incorporated in the subscription agreements and stock purchase plans under which plaintiff bought, in defendant's charter and in each certificate issued to plaintiff; the same option was required of all employee-stockholders as a condition of obtaining stock, whether by purchase or stock dividends, and no employee could acquire stock unless he granted defendant the option; plaintiff fully understood the option and its importance in maintaining defendant's status as an employee-owned corporation; the option was always exercised whenever an employee resigned or died so that stock never fell into the hands of an outsider; plaintiff voluntarily resigned as an employee to establish his own business; this was an event which made the option exercisable; he understood defendant wanted his stock back on such resignation; defendant exercised its option to purchase all his stock in writing on two occasions, first, in a letter signed by the Chicago District Manager and again in a letter from the home office in New York, and made other efforts to obtain his stock; plaintiff refused to sell the stock; and his sole reason for repudiating the option was because the stock was worth more than the option price and he wanted more money."

The only denial which plaintiff makes concerning this résumé of his oral admissions is that "defendant exercised its option to purchase all his stock in writing on two occasions, first, in a letter signed by the Chicago District Manager and again in a letter from the home office in New York, and made other efforts to obtain his stock.".

The District Court made findings which support Graybar's position that it properly exercised its option to purchase plaintiff's stock. Plaintiff contends that such findings are clearly erroneous and

should be rejected. With this contention we do not agree.

The Court, after finding that Graybar became entitled to exercise its option upon plaintiff's voluntary resignation as a Graybar employee as of June 30, 1953, further found:

"39. Graybar duly exercised its said option by a letter dated July 20, 1953 to Martin from Mr. W. E. Guy, then Martin's superior as Chicago District Manager and a Director of Graybar.

"40. As Graybar's Chicago District Manager, Mr. Guy was practically autonomous in dealing with matters in his district, including matters pertaining to termination of employment such as settling the employee's accounts and getting back his Graybar stock and voting trust certificates.

"41. Martin told Mr. Guy not to write him any more letters after receiving Mr. Guy's aforesaid letter of June 20, 1953, which requested that Martin return the Graybar preferred stock and voting trust certificates in his possession.

"42. Graybar also duly exercised its said option by a letter dated August 10, 1953 to Martin from Mr. A. C. Lamperti, Secretary and Comptroller of Graybar, and Agent for the Voting Trustees."

On July 20, 1953, Mr. Guy, then District Manager of Graybar's Chicago office, wrote plaintiff as follows:

"At the time you left you did not give a satisfactory answer in regard to the return of your Graybar Voting Trust Certificates both Common and Preferred. I am reminded that these are now past due, and will appreciate your letting me know if you will return them soon."

As the letter indicates and as plaintiff admitted, Guy had previously talked to plaintiff regarding the options. At that time plaintiff advised Guy that he would hold out for more money. Concerning this letter, plaintiff was asked, "And,

that first told you in writing that the Graybar Electric Company desired to exercise its option?" to which he answered, "That I would say."

The Court found that Guy was authorized to seek return of plaintiff's stock under the option, which the record supports. In fact, plaintiff admitted as much and volunteered the statement, "The official discussion was with Mr. Guy."

Upon refusal by plaintiff to comply with Guy's request, the matter was referred to the home office in New York. On August 10, 1953, a letter was sent to plaintiff, signed, "A. C. Lamperti, Agent for Voting Trustees." The letter was written on Graybar's stationery which showed Lamperti as "Secretary and Comptroller." Plaintiff described Lamperti as "an official of Graybar in New York," and believed him to be the Secretary.

■ We think there is no merit in plaintiff's suggestion that the August 10 letter is of no effect because it was signed by Lamperti as Agent of the Voting Trustees rather than as an agent of Graybar. The Voting Trust Certificates held by plaintiff were governed by the option. At any rate, as subsequently shown, plaintiff was not misled by the manner in which the letter was signed. The letter stated:

"I regret to learn that you are unwilling to turn in your Graybar stock for redemption at the price provided in the plan under which the stock was issued.

"Under the circumstances, since you are no longer in our employ, I have no alternative but to inform you we have issued today, and are holding in our possession, two checks in the amounts of $12,249.61 and $5,957.52 covering the redemption value of 610 shares of common stock and 297 shares of preferred stock, respectively, with proper adjustments for accrued dividends to date.

"Upon receipt of the stock certificates which you are now holding,

properly endorsed and witnessed, these checks will be promptly mailed to you."

As to the meaning and purpose of this letter, plaintiff testified:

"A. I think they were attempting—their attempt was to secure this Stock and the Voting Trust Certificates that I held.

"Q. In accordance with the options, is that correct? A. In accordance with their means and what had previously gone forward which were the options, yes.

"Q. At the price of twenty dollars a share, is that correct? A. Yes.

"Q. And you understood the letter to have that purpose when you received it? A. I'd say so, yes."

The option did not prescribe a set form of notice. It merely required that written notice be mailed to a stockholder, stating "in substance" that the corporation had elected to exercise its option and would pay for the stock.

■ We agree with the District Court that the letters of July 20, 1953 and August 10, 1953 constituted an exercise by Graybar of its option to purchase plaintiff's stock and certificates. The fact that the second letter was written does not indicate, as implied by plaintiff, that the first letter was not sufficient. Especially is this true in view of plaintiff's acute awareness, acquired over a period of twenty-five years, of Graybar's rights under the option agreement. Plaintiff, as he testified, was fully aware of the purpose of both letters. More than that, he did not refuse to surrender his stock and certificates because of any imperfection in the manner in which Graybar sought to exercise its option. His refusal was based solely on the premise that he wanted more money than Graybar was obligated to pay under the option agreement.

■ Plaintiff contends that the option provision was illegal and unenforceable under the law of the state of New York. Graybar contends to the contrary. Both

sides agree that the law of that state is controlling, and both rely upon Allen v. Biltmore Tissue Corp., 2 N.Y.2d 534, 161 N.Y.S.2d 418, 141 N.E.2d 812, 61 A.L.R. 2d 1309. The opinion in that case is lengthy and we shall not attempt to analyze it in detail. Even though there is some difference in the factual situation, we are convinced from our study of the case that it supports the legality and enforceability of the option provision in the instant case. The Appellate Division in Allen held the option invalid, which holding was reversed by the New York Court of Appeals. In that case, as here, it was claimed that the option was an unreasonable restraint on transferability. In response to this contention, the Court of Appeals stated (2 N.Y.2d at page 541, 161 N.Y.S.2d at page 422, 141 N.E.2d at page 815):

> "The question posed, therefore, is whether the provision, according the corporation *a right or first option to purchase the stock at the price which it originally received for it, amounts to an unreasonable restraint. In our judgment, it does not.*
>
> "The courts have almost uniformly held valid and enforcible the first option provision, in charter or by-law, whereby a shareholder desirous of selling his stock is required to afford the corporation, his fellow stockholders or both an opportunity to buy it before he is free to offer it to outsiders. [Citing numerous cases and other authority.] * * * 'The weight of authority is to the effect that a corporate by-law which requires the owner of the stock to give the other stockholders of the corporation * * * *an option to purchase the same at an agreed price or the then-existing book value before offering the stock for sale to an outsider, is a valid and reasonable restriction* and binding upon the stockholders'. [Italics the Court's.]"

The plaintiff in the Allen case, like the plaintiff here, repudiated the option because he considered the option price unfair. The Court stated (2 N.Y.2d at page 543, 161 N.Y.S.2d at page 423, 141 N.E. 2d at page 816) that such a repudiation "would encourage expensive litigation in every case where the price specified in a restriction" was other than the fair market value, and "would destroy part of the social utility of the first option."

Similar provisions, whether contained in the corporate charter, by-laws or stockholders' agreements, have been sustained in other New York cases. (In the instant situation, as previously noted, the option provision was contained in the charter, in all stockholders' agreements and in the share and trust certificates.) See Moses v. Soule, 63 Misc. 203, 118 N.Y.S. 410, affirmed 136 App.Div. 904, 120 N.Y.S. 1136; Hassel v. Pohle, 214 App.Div. 654, 212 N.Y.S. 561; Cowles v. Cowles Realty Co., 201 App.Div. 460, 194 N.Y.S. 546.

More than that, it is our view that we need not be concerned with plaintiff's right to transfer his stock or what might happen to the transferee in the event he attempted to do so. That situation is not before us and it is not easy to visualize how it could arise. The fact is, the question has not arisen during the time the option provision has been in effect, a period of more than twenty-five years. During that time hundreds of employees have recognized the option provision as valid and on resignation or death, have returned their stock to Graybar, in conformity with their contracts. More than that, as already pointed out, plaintiff during all that time has voluntarily recognized the provision as valid and binding, and he is the first to repudiate his option agreement by a refusal to comply with its plain requirements.

The major portion of plaintiff's brief is devoted to the contention:

> "The District Court failed to make any findings whatever from the evidence on the issue of whether the option was an integral part of a plan and conspiracy to separate permanently or for an indefinite time, the voting rights of voting stock in defendant from the owners thereof and

to vest the same in a limited self-perpetuating group of Voting Trustees, in violation of the laws of New York relating to corporations."

This defense was raised by plaintiff's answer to Graybar's counterclaim which sought an enforcement of the option provision.

Three 10-year Voting Trusts are involved in the discussion, referred to as the first, second and third. The first was created in 1928, the second in 1938 and the third in 1948. All of Graybar's stock owned by its employees was delivered by Graybar to the 1928 trust, for which trust certificates were issued to shareholders. At the expiration of the first trust, the shares were delivered to the second trust, and trust certificates were issued to the shareholders. At the expiration of the second trust, the stock was delivered to the third trust, and again trust certificates were issued to the shareholders. A fourth Voting Trust was established in 1958, after plaintiff's retirement, to which he did not become a party. The last Voting Trust of which plaintiff was a party was that of 1948, which terminated in 1958.

The District Court made specific findings as to the circumstances surrounding the establishment of each trust, together with the reasons therefor. The Court found in substance that the reasons for each successive voting trust were fully explained to all Graybar stockholders, including plaintiff, and that they signified their approval and became parties to each of such agreements by signing powers of attorney. The Court specifically found:

"No Graybar stockholder was ever threatened with discharge or duress if he failed to agree to the inclusion of his common stock in any of the respective voting trusts."

■ Graybar argues that any issue of legality of the Voting Trusts is irrelevant because it is an entirely separate matter from the option agreement and for the further reason that plaintiff is no longer a party to any trust agreement. We think there is merit to this contention. Graybar is not seeking to enforce any Voting Trust rights but to enforce the option agreement contained in the corporate charter, which is binding upon all stockholders, including plaintiff, irrespective of the provisions of the trust agreements. More than that, plaintiff under the circumstances had a contractual obligation to his fellow employees (shareholders), as well as to the corporation, to comply with the option provision. Roberts v. Roberts-Wicks Co., 184 N.Y. 257, 263, 77 N.E. 13, 16, 3 L.R.A.,N.S., 1034; Millspaugh v. Cassedy, 191 App. Div. 221, 227, 228, 181 N.Y.S. 276, 282.

In any event, we agree with the Court's conclusion, "The Voting Trust Agreements dated as of November 5, 1928, July 15, 1938, January 15, 1948 and October 15, 1957, respectively, were and are valid and lawful in all respects," and "Such Voting Trust Agreements were authorized in writing by all common stockholders of Graybar Management and of Graybar after the consolidation in 1939."

Section 50 of the Stock Corporation Law of New York (McKinney's Consolidated Laws of New York, Book 58) provides:

"A stockholder, by agreement in writing, may transfer his stock to a voting trustee or trustees for the purpose of conferring the right to vote thereon for a period not exceeding ten years upon the terms and conditions therein stated. Every other stockholder may transfer his stock to the same trustee or trustees and thereupon shall be a party to such agreement. The certificate of stock so transferred shall be surrendered and cancelled and new certificates therefor issued to such trustee or trustees in which it shall appear that they are issued pursuant to such agreement, and in the entry of such ownership in the proper books of such corporation that fact shall also be noted, and thereupon such trustee or trustees may **vote**

upon the stocks so transferred during the term of such agreement.

\* \* \* "

Plaintiff contends that the Voting Trusts involved were not established in compliance with this statutory provision for four reasons, (1) that the stock was transferred to voting trustees by Graybar and not by the stockholders; (2) that each Voting Trust was for a term in excess of ten years; (3) that the option was a part of a plan for effecting renewals of Voting Trusts, and (4) that corporate funds were employed for the initiation and maintenance of Voting Trusts.

The short answer to all of these contentions is, as already pointed out, that every step taken in connection with each of the Voting Trusts was with the knowledge and voluntary consent of all stockholders, including plaintiff.

■ It is true that in the beginning Graybar's stock was transferred directly to the voting trustees, who in turn issued trust certificates to the owners of such stock, while the provision above quoted provides for the transfer of such stock from the holder to the voting trustee. In 277 Park Ave. Corp. v. New York Central R. R. Co., 194 Misc. 417, 425, 90 N.Y.S.2d 214, 220, affirmed 275 App.Div. 1028, 91 N.Y.S.2d 838, the same question was raised as to the validity of a Voting Trust. The Court overruled the contention and in so doing stated:

> "It would not be feasible in a situation such as was here presented, to require that the new stock be issued directly to widely-scattered security holders and then leave it to them to determine whether they would deposit it in a voting trust to which they had already given their consent."

In the instant case, as noted, plaintiff as well as other stockholders consented to deposit the stock in a Voting Trust by an instrument in writing which expressly authorized the transfer of stock by Graybar to the voting trustees under the Voting Trust agreement.

■ Plaintiff's second argument of non-compliance with the statute is that the Voting Trust lasted more than ten years, the maximum authorized by statute. Plaintiff argues that Graybar's common stock has been in a Voting Trust "decade after decade." The only basis for this statement is that there have been successive trusts. While the statute limits a Voting Trust to ten years, there is nothing which prohibits stockholders from agreeing to a new Voting Trust for an additional period of ten years. A successor trust for such additional period has been sustained where stockholders were free to decide whether to become parties thereto. Mannheimer v. Keehn, Sup., 41 N.Y.S.2d 542, modified 268 App. Div. 813, 49 N.Y.S.2d 304, amended 268 App.Div. 845, 51 N.Y.S.2d 750.

■ Plaintiff also argues that the Voting Trusts were authorized by stockholders in advance of the commencement date of the succeeding trust and adds that period to the 10-year Voting Trust period as a basis for the contention that the combined periods constitute Voting Trusts in excess of ten years. As illustrative, the 1948 Voting Trust, the last in which plaintiff participated, was dated January 15, 1948, to expire January 14, 1958, and plaintiff's irrevocable consent and authorization is dated December 26, 1947. Plaintiff claims that the document dated three weeks prior to the Voting Trust in effect constituted an extension of the Voting Trust so as to make it for a period of ten years and three weeks and was, therefore, for a longer period than the statute permits. This argument overlooks the fact that the stock was not transferred to the 1948 Voting Trust until April 30, 1948, at the time of the termination of the preceding trust. Therefore, the stock was in the 1948 Voting Trust for a period of less than ten years. Assuming, however, that the 1948 trust had an effective duration of ten years and three weeks, that would invalidate only the three-week excess period. Kittinger v. Churchill Evangelistic Association, 151 Misc. 350, 271

N.Y.S. 510, affirmed 244 App.Div. 877, 281 N.Y.S. 680.

 Plaintiff's third contention that the option, together with the establishment of the successive trusts, was part of a plan to control employees' free choice of action is without evidentiary support. Plaintiff testified that there was no duress and that he never heard of an employee being threatened with loss of employment or other reprisals for not agreeing to a Voting Trust. The record makes it clear that the plan, including the Voting Trusts, was promulgated in good faith to accomplish a purpose which both Graybar and its employees desired. It is highly significant, as previously noted, that all stockholders (employees), including plaintiff, freely gave their consent to every material step taken in the formation and carrying forth of the plan and that plaintiff made no objection until after his retirement, the event which under the terms of their contract gave Graybar the right to purchase his stock.

 Plaintiff's fourth contention that Graybar used corporate funds to defray the expenses of the Voting Trusts is without merit. The Voting Trusts to which plaintiff and all stockholders consented expressly provided that expenses should be paid by the corporation. Even if such expenses had been improperly paid from corporate funds, it is not discernible how that would affect the validity of the option or of the voting trusts.

 The Court, as noted, made findings which support the legality and enforceability of the option by which Graybar was entitled to acquire plaintiff's stock, as well as findings which support the legality of the Voting Trusts. In short, the Court's findings and conclusions support the judgment under attack. Thus, the findings completely negative the conspiracy charge advanced by plaintiff. We think there is no merit in plaintiff's contention that the Court erred in its failure to make specific findings upon the alleged conspiracy issue. In any event, the Court found, "There is no basis for the plaintiff's charges of misconduct against Graybar's officers and directors and the Voting Trustees." The record sustains this finding.

We have considered other issues advanced by the parties, which need not be stated or discussed as they would not affect the result.

The judgment appealed from is Affirmed.