Kaye, J.
(dissenting). By proceeding, as if inexorably, from Sabetay to Ingle to Gallagher, the court avoids confronting plaintiffs true claims and unnecessarily weakens traditional protections afforded minority shareholders in close corporations. I therefore respectfully dissent.
I.
To begin at a point of agreement, this case is significantly different from Ingle v Glamore Motor Sales (73 NY2d 183). As the majority acknowledges, this case presents "an alleged departure from a fiduciary duty of fair dealing existing independently of the employment” that was not present in Ingle (majority opn, at 566).
In Ingle we reached only the corporation’s duty to plaintiff as an employee, carving out and reserving for another day any question of the duty a corporation might owe an employee as a shareholder, which was not in issue. The court was careful to note that Mr. Ingle had already accepted full payment for his shares without reservation; while his complaint referred to a fiduciary duty owed him as a shareholder, the only interest he asserted in the litigation was in his job. In its succinct opinion the court took pains to emphasize at least six separate times that its concern was only with Mr. Ingle’s employment, not in any sense with the duty a corporation owes to a minority shareholder, or with undervaluation of shares (73 NY2d, at 187, 188, 189).
*569 Here, plaintiff does question the duty the corporation owes him as a shareholder. He does contend that the corporation undervalued his shares and that it did not offer a fair price for his equity interest. Indeed, that is the only question he raises; he does not challenge defendant’s absolute right to terminate his employment. Yet despite careful identification and recognition in Ingle of the different considerations such a question would present, now that the question is before us the court finds that the very same answer and the very same rationale are wholly dispositive, with no analysis of the fiduciary obligation owed plaintiff.
The court’s insistence that the rationale of Ingle and the other at-will employment cases must be carried over — lock, stock and barrel — even to the fiduciary obligations owed minority shareholders in close corporations, plainly represents an extension of the law to a different jural relationship. I believe this is wholly unwarranted.
II.
A fuller statement of the facts portrays both plaintiff’s true claims and the error of summary dismissal of his complaint.
Before he was dismissed on January 10, 1985, plaintiff (James V. Gallagher) was an officer and director of both defendant Eastdil Realty, Inc. and its wholly owned subsidiary, Eastdil Advisers, Inc. Eastdil Realty is a closely held real estate investing banking firm. Defendant Lambert is its founder, principal shareholder and chief executive officer. The other defendants are officers and shareholders of the corporation.
Gallagher was first employed by Eastdil Realty as vice-president, from 1968 to 1973, when he left to start his own firm. He returned as a consultant in 1976, and was soon offered a full-time position as vice-president at a base salary of $60,000. In 1978, Gallagher was appointed president and chief executive officer of the newly created Eastdil Advisors, and he was elected to Eastdil’s board of directors in 1980. As Gallagher’s responsibilities increased, his salary and bonuses rose commensurately and steadily — from $135,000 in 1979 to more than a million dollars for the fiscal year ending on January 31, 1984.
In 1981, a number of executives of Eastdil Realty were offered the opportunity to purchase shares of class B nonvoting stock in the company. Gallagher bought 4% — 40 shares— *570 at $100 a share. Lambert continued to own all of the voting stock. In connection with his purchase of shares, Gallagher executed a stockholders’ agreement that contained a mandatory repurchase provision, For a period of two years "commencing with the voluntary resignation or other termination of any class B stockholder’s employment with the company,” the company had a right to reacquire the shares. The agreement set the repurchase price at book value.
In mid-1983, Eastdil implemented a recapitalization plan. All of the voting stock was to be retired, and the nonvoting shares increased and redistributed, and then converted into voting common stock. As Gallagher alleges, the recapitalization was no act of charity by the corporation; it was a response to a mass exodus of valued employees, and an effort to forestall further defections by offering financial incentives to continue with the corporation at least to year-end.
In summer 1984, Gallagher received 8.5% of Eastdil’s stock, becoming the third largest shareholder, and he executed an amended stockholders’ agreement. The agreement continued to provide for mandatory repurchase at book value upon "voluntary resignation or other termination” of employment. But it also stipulated that after January 31, 1985, the buy-out price would be calculated by an escalating formula based on the company’s earnings and the length of the shareholder’s employment. According to Gallagher, the new buy-out price represented "golden handcuffs” designed to induce employees to remain on, at least until January 31, 1985.
On January 10, 1985 — just 21 days before the new valuation formula became effective — Gallagher was fired and Eastdil invoked its right to repurchase his stock at book value. According to Gallagher, book value for the shares was $89,000; the price under the new valuation formula would have been around $3,000,000.
After Gallagher’s refusal to deliver his shares at book value, and defendants’ refusal to pay the higher value, Gallagher began this damages action for breach of contract, breach of fiduciary duty, breach of a duty of good faith and fair dealing, and other alleged wrongdoing. For nearly a year defendants conducted discovery of plaintiff — including a very extensive deposition — and then sought summary judgment; plaintiff had no discovery whatever. The trial court denied defendants’ motion, noting factual issues concerning defendants’ motive for firing plaintiff, and that it "would clearly be an injustice to grant * * * defendants’ motion, when plaintiff has had no *571 disclosure at all.” A divided Appellate Division reversed; dismissed plaintiffs causes of action for breach of contract, breach of fiduciary duty, and breach of a duty of good faith and fair dealing; granted defendants specific performance of the amended stockholders’ agreement; and granted plaintiff leave to appeal to this court on a certified question.
III.
Gallagher alleges that defendants had no bona fide, business-related reason to terminate his employment when they did — assertions we must accept as true on this summary judgment motion. He charges that defendants fired him for the sole purpose of recapturing his shares at an unfairly low price and redistributing them among themselves.
These claims put in issue an aspect of the employee-shareholder relationship that we have not previously considered in our at-will employment cases. Plaintiff claims that defendants, the holders of a majority of the corporate stock, breached distinctly different duties to him by manipulating his termination so as to deprive him of the opportunity to reap the benefits of a "golden handcuffs” agreement, and for no other reason than to effect repurchase of his shares at less than their fair value. In short, plaintiff claims defendants breached two duties related to each other but conceptually unrelated to his at-will employment status: (1) a duty of good faith in the performance of the shareholders’ agreement, and (2) a fiduciary obligation owed to him as a minority shareholder by the controlling shareholders to refrain from purely self-aggrandizing conduct. Neither claim is foreclosed by plaintiff’s status as an at-will employee.
If plaintiff were a minority shareholder, but not an employee, defendants would be barred from acting selfishly and opportunistically, for no corporate purpose, as he alleges they did. The controlling stockholders in a close corporation stand, in relation to minority owners, in the same fiduciary position as corporate directors generally, and are held "to the extreme measure of candor, unselfishness and good faith.” (Kavanaugh v Kavanaugh Knitting Co., 226 NY 185, 193.) Although, without more, the courts will not interfere when parties have set the repurchase price at book value (Allen v Biltmore Tissue Corp., 2 NY2d 534, 542-543), here plaintiff asserts there was more. The corporation agreed, commencing January 31, 1985, to pay a higher price, said to be more reflective of the *572 true value of defendant’s shares.* Defendants’ invocation of the pre-January 31 repurchase price was adverse to plaintiffs interests as a minority stockholder, and therefore subject to a standard of good faith under the foregoing principles.
Directors and majority shareholders may not act "for the aggrandizement or undue advantage of the fiduciary to the exclusion or detriment of the [minority] stockholders.” (Alpert v 28 Williams St. Corp., 63 NY2d 557, 569 [citing cases].) Nor is it considered a legitimate corporate interest if the sole purpose is reduction of the number of profit-sharers, or ultimately "to increase the individual wealth of the remaining shareholders” (id., at 573). Yet that is precisely what we must assume defendants’ motive was, and this court now sanctions such conduct.
Defendants’ broad interpretation of the "other termination” language of the repurchase clause amounts to an assertion that plaintiff agreed to waive substantial rights he might otherwise have possessed as a minority shareholder. However, in the absence of evidence that plaintiff knowingly assented to such a waiver, I cannot agree that the general language of the clause unambiguously expresses an understanding that the option could be exploited for the sole personal gain of the controlling shareholders in derogation of their fiduciary obligations to minority shareholders. Notably, the repurchase clause contains no reference to plaintiff’s at-will employment status and no reservation of defendant’s right to discharge plaintiff for any reason at all.
Moreover, defendants’ interpretation denies that defendants themselves had any duty of good faith in connection with the shareholders’ agreement. We have said that "there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.” (Kirke La Shelle Co. v Armstrong Co., 263 NY 79, 87.) This general rule does not apply to at-will employment relationships, as "it would be incongruous to say that an inference may be drawn that the employer impliedly *573 agreed to a provision which would be destructive of his right of termination.” (Murphy v American Home Prods. Corp., 58 NY2d 293, 304-305.) It does not follow, however, that there can be no covenant of good faith implicit in the shareholders’ agreement that gives rise to obligations surviving termination of the employment relationship.
Assuming plaintiff’s claims about the purpose of the amendments to be true, the expectations and relationship of the parties, as structured by the shareholders’ agreement, dictate an implied contractual obligation of good faith, notwithstanding that there is none in their employment relationship (see, Wakefield v Northern Telecom, 769 F2d 109 [2d Cir]). A covenant of good faith is anomalous in the context of at-will employment because performance and entitlement to benefits are simultaneous. Termination even without cause does not operate to deprive the employee of the benefits promised in return for performance.
But the alleged "golden handcuffs” agreement is different. An implied covenant of good faith is necessary to enable the employee to receive the benefits promised for performance. As one court noted, "an unfettered right to avoid payment * * * creates incentives counterproductive to the purpose of the contract itself in that the better the performance by the employee, the greater the temptation to terminate.” (Wake-field v Northern Telecom, supra, at 112-113; Note, Exercising Options to Repurchase Employee-Held Stock: A Question of Good Faith, 68 Yale LJ 773, 779 [1959].)
Finally, defendants’ construction of the agreement not only is inconsistent with the purpose alleged by plaintiff but also would authorize the forfeiture by plaintiff of significant benefits he claims to have all but earned through his service. Contracting parties surely may agree to terms that are inimical to their interests. But provisions purporting to authorize forfeitures should be strictly construed (3 Corbin, Contracts § 552, at 212), and absent contractual language that permits no other reasonable interpretation, "such provisions will be construed to prevent arbitrary action in reliance on them.” (Lemmon v Cedar Point, 406 F2d 94, 97 [6th Cir 1969].) Here, the language relied upon by defendants cannot be deemed so clear as to unambiguously constitute an agreement by plaintiff to cede the fiduciary duties owed him as a shareholder and relinquish his entitlement to a higher price for his stock solely for defendants’ pecuniary benefit.
*574 IV.
Denial of summary judgment would deprive defendants of no legitimate expectation or right, contractual or otherwise. Under the law, they remain free to terminate plaintiffs employment as agreed; they remain free to buy back his stock at book value as agreed — so long as there is a corporate purpose for their conduct. What controlling shareholders cannot do to a minority shareholder is take action against him solely for the self-aggrandizing, opportunistic purpose of themselves acquiring his shares at the low price, and they cannot do this because in the law it means something to be a shareholder, particularly a minority shareholder.
Because the majority gives no credence whatever to plaintiffs independent status as a shareholder, and because the majority now needlessly extends the at-will employment doctrine yet another notch, to diminish the long-recognized duties owed minority shareholders, I must dissent.
Judges Simons, Alexander and Titone concur with Judge Bellacosa; Judge Hancock, Jr., concurs in a separate opinion; Judge Kaye dissents and votes to reverse in another opinion in which Chief Judge Wachtler concurs.
Order affirmed, etc.

 The majority’s premise that certainty would be undermined, and "costly and lengthy litigation on the 'fair value’ issue” would ensue (majority opn, at 567) simply is without basis. No one proposes a valuation proceeding, or any other uncertainty. The only issue is which of the two values fixed in the agreement should apply.