SCOTT P. GRANDON *et al.*, Plaintiffs-Appellants, v. AMCORE TRUST COMPANY *et al.*, Defendant-Appellee.

Third District   No. 3—91—0333

Opinion filed January 30, 1992.—Rehearing denied March 30, 1992.

Conde, Stoner & Killoren, of Rochelle (Alan H. Cooper and Rodolphe J.A. de Seife, of counsel), for appellants.

Ludens, Potter & Burch, of Morrison (Thomas J. Potter, of counsel), for appellee.

JUSTICE HAASE delivered the opinion of the court:

The plaintiffs are the majority shareholders of the Sterling Gazette Company. The plaintiffs brought suit to enforce a restrictive legend contained on 33 shares of company stock owned by the defendant

trusts. The restrictive legend printed on the face of the disputed shares recites that they must be sold back to the company for $250 per share upon certain conditions. The plaintiffs claim the conditions for sale have been met. The defendants claim the restrictions are invalid. The trial court ruled that the plaintiffs failed to prove the validity of the restrictions. The plaintiffs appeal. We affirm.

The Sterling Gazette Company (SGC) is an Illinois corporation formed in 1903. SGC publishes the Sterling Daily Gazette, a daily newspaper. Majority ownership of SGC came into the Grandon family in the early part of this century. Each plaintiff acquired his or her shares in SGC from his or her paternal grandfather, Preston Grandon (Preston). Preston was the majority shareholder and publisher of the paper from 1943 until he died in 1968. After Preston's death, SGC was run by David Grandon, Preston's only child.

The defendant trusts acquired their shares from Marie Grandon (Marie), Preston's third wife. Marie created the defendant trusts for the benefit of her children by a prior marriage, Robert Moncelle and Marjorie Taylor. Marie obtained the disputed shares during her marriage to Preston. The shares had been the property of Donald Dickinson, a director of SGC. When Dickinson died in 1964, the corporation authorized Preston, as president, to exercise its right to purchase Dickinson's shares for $250 per share. The shares were then surrendered to SGC and reissued to Marie. The shares issued to Marie contained the same restrictive legend that had been printed on Dickinson's shares. The restriction provided that the purchaser of the stock agreed to resell the stock to SGC for $250 per share upon the shareholder's death or severance of his or her connection with the company.

When Marie died on July 16, 1978, included among her assets were the 33 shares of SGC stock she obtained in 1964. On November 15, 1978, Stephan Jablonsky, SGC's business manager, wrote to the Central National Bank advising the bank that SGC wanted to acquire the 33 shares for the price of $250 per share. The bank responded that it would honor the restrictive legend "[b]ut feel we are obligated to request some form of documentation regarding the agreement." Apparently, SGC made no reply to the bank's request. In a letter dated April 16, 1979, SGC again offered to purchase the 33 restricted shares at $250 per share. The record does not contain a response to SGC's offer.

On September 15, 1980, John Kuczynski, a trust officer at the bank, contacted Mr. Jablonsky concerning the 33 shares. Kuczynski informed Jablonsky that two trusts had been created by Marie Gran-

don for the benefit of her children. According to the trust documents, the shares were to be divided equally among her two children and placed in trust. The bank then delivered the 33 shares to SGC and SGC issued new shares. SGC issued 16.5 shares designated for the Robert Moncelle Trust and 16.5 shares for the Marjorie Taylor Trust. These new shares contained the same restrictive legend printed on the original 33 shares.

On July, 10, 1986, SGC's attorney wrote the bank's trust department and informed them that the SGC board of directors had passed a resolution that the shares be redeemed at $250 per share. The bank refused to relinquish the shares. The present action then ensued.

After a bench trial, the court entered judgment in favor of the defendants. The court ruled that the plaintiffs failed to prove that the original 33 shares of stock were subject to a valid restriction. The court based its ruling on the fact SGC's articles of incorporation did not authorize a second class of stock nor did the plaintiffs prove that Marie Grandon and SGC had entered into a separate contract for the issuance of the restricted shares.

In Illinois, the Close Corporation Act provides that a close corporation may place reasonable restrictions on the transfer of its stock if the restriction is conspicuously stated upon the face or back of the stock certificates. (Ill. Rev. Stat. 1985, ch. 32, par. 1201 *et seq.*) The Close Corporation Act also requires that any corporation desiring to be covered under the Act must register with the Secretary of State as a close corporation. (Ill. Rev. Stat. 1985, ch. 32, par. 1205.) Failure to register does not preclude a corporation from being treated as a close corporation. Instead, the nonregistered corporation must look to the common law if it desires close corporation treatment.

In the case at bar, SGC asserts it should be treated as a close corporation even though it failed to register. A review of the common law reveals that SGC meets the classic definition of a close corporation. A close corporation is defined as a corporation in which the stock is held in a few hands, or in a few families, and wherein it is not at all, or only rarely, dealt in by buying or selling. (*Galler v. Galler* (1964), 32 Ill. 2d 16, 26.) The reason SGC's corporate status is important lies in the fundamental differences between the close corporation and the public issue corporation.

In general, the close corporation is not required to comply with the strict corporate formalities imposed upon the public-issue corporation and the close corporation is allowed greater control over the disposition of its stock than a public-issue corporation. The reason the two are treated differently is due to the fact the shareholder of a pub-

lic-issue corporation and his counterpart in the close corporation are not similarly situated. For example, the public-issue shareholder is normally not involved in the daily operations of the corporation and may freely sell his shares on the open market if he feels the management has failed to exercise sound business judgment.

In contrast, the close corporation shareholder often has a large total of his entire capital invested in the business and is intimately involved with the daily operations of the business. With no open market in which to sell his shares and only a small number of shares issued, the shareholders of the close corporation, in effect, become partners with the other shareholders. As one commentator noted:

> "Since the success of a small corporation may depend on the business acumen of the participants, the shareholders may wish to make certain that they will not have to deal with possibly untalented or uncongenial associates in the future. Thus they may wish to limit the group to whom shares may be sold ***."
> Hornstein, *Stockholders' Agreements in the Closely Held Corporation*, 59 Yale L.J. 1040, 1047-48 (1950).

The method most close corporations use to keep control of their stock is through stock transfer restrictions, normally contained in buy and sell agreements. (See 12 W. Fletcher, Cyclopedia of the Law of Private Corporations, at 5461.1 (1985).) Such restrictions usually require that upon the withdrawal or death of a stockholder, his or her shares will be sold or transferred only to the remaining stockholders or to the corporation or at least will be offered first to this group before being sold to outsiders. (See Annot., 54 A.L.R.3d 790, 796 (1974).) Such agreements usually contain a provision on the price at which the stock will be sold. This is true because there is generally no easy way in a close corporation to ascertain the stock's fair market value. See *Allen v. Biltmore Tissue Corp.* (1957), 2 N.Y.2d 534, 161 N.Y.S.2d 418, 141 N.E.2d 812.

Transfer restrictions are usually contained in a corporation's articles of incorporation, bylaws or in a shareholders buy-sell agreement. Since SGC's articles of incorporation state its shares are freely transferable, and there is no evidence of a restrictive bylaw, our analysis is limited to shareholders agreements.

A shareholders agreement is a contractual arrangement in which the shareholders agree among themselves, or with the corporation, not to transfer or sell their stock to outsiders without first giving the shareholders or the corporation the opportunity to purchase their shares. As the Illinois Supreme Court noted in *Vogel v. Melish* (1964), 31 Ill. 2d 620: "The essence of the stockholder's agreement is the

granting of reciprocal options on the other party's shares, or right of first refusal on those shares, as it is sometimes called." (31 Ill. 2d at 624.) Being contractual in nature, the requirements for a valid contract (*i.e.*, offer, acceptance, and consideration) must be established if the agreement is to be upheld.

The plaintiffs argue that Marie's acceptance of the restricted shares constituted sufficient consideration to bind her and her successors. In support of this contention, the plaintiffs rely on *Douglas v. Aurora Daily News Co.* (1911), 160 Ill. App. 506.

In *Douglas*, the plaintiff's employer, the Aurora Daily News, issued to the plaintiff stock bearing a restrictive legend. When the plaintiff severed his employment with the company, the company sought to enforce the stocks' restrictive provision. The plaintiff argued that the provision was contractually invalid for lack of consideration. Even though the stock was transferred to the plaintiff as a "gratuity," the court ruled the restriction was legally enforceable. The court based its ruling on the fact that even though the stock was given gratuitously, each side received a benefit from the transaction:

> "[T]he original certificate was issued to Douglas, an employee of the Aurora Daily News, as a gratuity, with the object of making the employees of the paper feel a personal interest in the welfare of the Company." 160 Ill. App. at 509.

Since the *Douglas* decision, numerous scholars and business experts have encouraged the use of employee stock option plans as a method of increasing employee productivity. (See Jensen & Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs & Ownership Structure*, 3 J. Fin. Econ. 305 (1976); Demsetz, *The Structure of Ownership & Theory of the Firm*, 26 J.L. & Econ. 375 (1983); Coffee, *Shareholders Versus Managers: The Strain in the Corporate Web*, 85 Mich. L. Rev. 1 (1986).) The fundamental premise of these stock plans is that when an employer "gives" an employee stock, or the right to purchase stock, the employer receives a harder working employee and the employee receives a part of the company in return, a definite *quid pro quo*.

In contrast, the law presumes that exchanges of property or services between family members are truly gratuitous. For example, services rendered to family members, without a contract or agreement to pay therefor, are presumed to be gratuitous and do not constitute sufficient consideration to support a contract. (*Meyer v. Meyer* (1942), 379 Ill. 97, 39 N.E.2d 311.) Likewise, the law presumes a gift occurs when one spouse delivers property to the other. (*In re Marriage of Simmons* (1980), 87 Ill. App. 3d 651, 409 N.E.2d 321.) This presump-

tion can be overcome by clear and convincing evidence that no gift was intended (*Lawyer v. Lawyer* (1974), 19 Ill. App. 3d 571, 312 N.E.2d 7), but the person seeking to overcome this presumption carries the burden of proof.

In the case at bar, the evidence indicates the disputed shares were issued to Marie Grandon as a gift from her husband, Preston Grandon. As the trial court noted, "Mr. Jablonsky said Mr. Preston Grandon gave the Stock to Marie. No party presented evidence of payment for those shares." Because no evidence was presented to rebut the presumption that the shares were transferred to Marie as a gratuity, the trial court correctly ruled that the plaintiffs had failed to prove the validity of the restriction. There was no proof of any consideration which passed between the parties to support a finding of a contract in the nature of a buy and sell agreement.

The parties agree that Marie could only transfer to the defendant trusts the interest in the stock that she possessed. Likewise, any restriction on the stock which Marie transferred could only be valid if it was a valid restriction at the time Marie owned the stock. Since we have determined that Marie owned the stock unencumbered by any restriction, there was no such restriction which passed to the trust at the time of the assignment.

Furthermore, it is clear that no consideration passed between the trusts and the corporation which would support a buy and sell agreement. Therefore, we hold that there was no restriction against transfer of the shares at the time that Marie obtained the shares and there was no valid restriction on transfer of shares at the time that the trusts obtained a reissue of Marie's shares by SGC.

The order of the circuit court of Whiteside County is hereby affirmed.

Affirmed.

GORMAN and SLATER, JJ., concur.