**SPARTANS INDUSTRIES, INC.**

v.

**JOHN PILLING SHOE COMPANY.**

**Civ. A. No. 66-279.**

United States District Court
D. Massachusetts.

Jan. 13, 1967.

---

James P. Lynch, Jr., Charles R. Parrott, Irving J. Helman, Nutter, McClennen & Fish, Boston, Mass., Alvin M. Stein, Parker, Chapin & Flattau, New York City (of counsel), for plaintiff Spartans Industries, Inc.

Jacob S. Temkin, Samuel A. Olevson, Providence, R. I., for defendant John Pilling Shoe Company.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WYZANSKI, Chief Judge.

This diversity jurisdiction case presents questions, admittedly governed by New York law, as to the interpretation or, more properly, the construction of the option provisions of an agreement under which a corporation owning (through subsidiaries) a chain of retail stores licensed another corporation to op-

erate in those stores what are called "leased" shoe departments.

Pursuant to the diversity jurisdiction and declaratory judgment statutes, 28 U.S.C. §§ 1332 and 2201, Spartans, Inc., a Delaware corporation [hereafter called "Spartans"], brought against John Pilling Shoe Company, a Massachusetts corporation [hereafter called "Pilling"], this action seeking declarations respecting the November 1, 1963 agreement between Pilling and a Delaware corporation then called Virginia Dare Stores Corporation, but since 1963 known as Atlantic Thrift Centers, Inc. [usually hereafter called "V–A"], specific enforcement of that agreement, and damages for breach of it.

With respect to the issues of construction and specific enforcement, the parties stipulated that they had submitted to the Court all the evidence they would tender at a plenary trial, that with respect to those issues there is no genuine issue of fact, and that upon the evidence submitted the Court should adjudicate those issues.

Upon the submitted evidence the Court finds that these are the material and relevant facts:

1. In 1940 there was incorporated in Delaware Virginia Dare Stores Corporation, which in 1964 changed its name to Atlantic Thrift Centers, Inc. In March 1955 it began to operate through subsidiaries discount department stores.

2. Pilling, directly and through affiliated companies, among other activities, beginning in 1955 operated retail shoe departments in V–A discount department stores. Initially those operations were not covered by a formal agreement. Pilling and V–A carried on extensive negotiations with respect to a possible formal understanding, and, as a result, they entered into a comprehensive, detailed agreement dated November 1, 1963 [hereafter called the 1963 agreement]. The agreement recited that "the parties desire to formalize the present arrangement and to set forth their agreement with regard to the operation of future departments in additional" V–A stores.

3. The agreement covers 20 typewritten pages as well as annexed schedules. It falls into 16 main divisions, called by the parties "paragraphs." Of these, paragraph XII is the one directly in issue in the case at bar. But it is appropriate briefly to indicate how comprehensive and detailed are the elaborate provisions of the agreement as a whole. Included are provisions which minutely govern (I) the standard form of licensing contract or, as it is called, sublease under which a Pilling affiliate is to operate a retail shoe outlet at a discount department store in the V–A chain, (II) the extension of subleases to newly acquired discount department stores, (III) methods of assuring harmony in the policies of the sublease shoe departments and the discount stores, (IV and V) exchanges of relevant financial information between the parties, (VI) the effects of financial difficulties such as bankruptcy and assignment for the benefit of creditors, (VII) the rate of rental payments by the sublessees, (VIII) restrictions on Pilling's right to have retail shoe departments elsewhere, (IX) changes in the management of Pilling's business, (X) the period of time covered by the agreement, (XI) waiver of jury trial where there is a dispute, (XII) changes in V–A as a consequence of mergers, consolidations, and sales, (XIII) procedure for arbitration of certain matters, (XIV) methods of sending notice, (XV) the application of New York law to controversies, and (XVI) upon whom the contract is binding.

4. It is in this elaborate setting that there is placed the crucial Paragraph XII which reads as follows:

"XII. In the event that during the term of this Agreement:

(a) VIRGINIA DARE shall merge into or be consolidated with another corporation; or

(b) VIRGINIA DARE shall sell all or substantially all of its assets as a going concern; then, and in any such case, PILLING agrees that the merg-

ing or consolidating corporation or the purchaser of assets or stocks of VIRGINIA DARE, (hereinafter for convenience called the 'PURCHASER') shall have the option to purchase the assets and business of the affiliated corporations of PILLING and PILLING agrees to sell such assets and business on the terms hereinafter set forth. The option of the PURCHASER shall relate to the purchase of the assets subject only to the liabilities as shown on the Consolidated Balance Sheet of PILLING as of the date of closing (or at the end of the month nearest thereto) of the transaction between VIRGINIA DARE and the PURCHASER. Such : Balance Sheet of PILLING shall be prepared by DAVID BERDON & CO. for PILLING at its expense. The purchase price to be paid by the PURCHASER to PILLING shall be on the same basis whether stock, cash or other securities as is received by VIRGINIA DARE or its stockholders with respect to its net worth as compared to the net worth of PILLING as shown by the Balance Sheet prepared by DAVID BERDON & CO., as aforesaid. DAVID BERDON & CO. shall likewise compute the manner in which the consideration received by VIRGINIA DARE or its stockholders from the PURCHASER shall be applied to the net worth of PILLING in order to ascertain the consideration to be paid by the PURCHASER to PILLING and their determination shall be final and binding upon the parties hereto. Simultaneously with the execution of the Contract relating to the sale of assets or merger or consolidation of VIRGINIA DARE, the PURCHASER shall notify PILLING in writing at PILLING'S address as stated above, of its intention to exercise the option granted under this Paragraph and in the event that such option is exercised, as herein provided, such PURCHASER shall simultaneously with the closing make payment to PILLING of the consideration required to be paid to PILLING

by virtue of the exercise of this option and PILLING shall at such closing execute and deliver to the PURCHASER all documents that counsel for the PURCHASER may reasonably require in order to legally vest in the PURCHASER good and marketable title of the assets, subject to the liabilities shown in the Balance Sheet prepared by DAVID BERDON & CO. as aforesaid, subject only to the changes occurring in the normal and regular course of business subsequent thereto."

5. While Paragraph IX is not directly in issue in the case at bar, it too must be quoted because of the light it may throw on Paragraph XII, it provides:

"IX. PILLING recognizes that VIRGINIA DARE would be materially and adversely affected if the management of PILLING'S business was changed without VIRGINIA DARE'S approval, and accordingly PILLING agrees that it will not make any sale of all or any substantial part of its assets without the written consent of VIRGINIA DARE reasonably exercised, except to a parent, subsidiary or affiliated corporation. For the purposes of this Agreement, a sale or transfer of stock which causes or which can cause a change in management of PILLING shall be deemed a sale of a substantial part of the assets of PILLING requiring the consent of VIRGINIA DARE. If PILLING shall make any sale as herein provided without the consent of VIRGINIA DARE, then it is agreed that the sole remedy of VIRGINIA DARE shall be, and PILLING consents that VIRGINIA DARE shall have the right, within sixty (60) days thereafter, to cancel all of the subleases then in effect between the parties hereto and their subsidiaries and affiliated corporations, such cancellation to take effect as of a date which will correspond to one year and two months from the end of the sublease year in which the sale causing such notice takes place, unless such sale

takes place prior to May 1st of any year in which case such cancellation shall become effective as of a date which will correspond to two months from the end of the sublease year in which such sale takes place. If such notice of cancellation is sent, all subleases then in effect with PILLING and its affiliated corporations shall expire and end on the date set forth in said notice, as though said date had originally been fixed as the expiration date of such subleases. Nothing herein contained shall be deemed to prohibit or prevent PILLING or its stockholder from making a public or private sale of less than a controlling interest in the outstanding capital stock of PILLING. The provisions of this Paragraph IX shall not be subject to change except by mutual agreement and neither party hereto shall have the right to demand any change with respect of this Paragraph in any extension of this Agreement and the subject matter of this Paragraph is expressly excluded from any arbitration under this Agreement."

6. In order to aid in the construction of Paragraph XII, and to show its purpose, plaintiffs offered the testimony of two of the negotiators of the 1963 agreement—Thaler who represented Pilling and Mittleman who represented V–A.

7. Thaler's deposition shows that the representatives of V–A were concerned with a situation which might arise if a chain of department stores "were to come along and wanted to buy our company [V–A] and didn't want a lease shoe department." Thaler says he agreed that there should be some provision preventing Pilling from blocking the sale.

8. Mittleman's affidavit states that during the negotiations he pointed out (a) the managerial relation between Pilling and V–A, (b) the necessity for providing for a termination of the relationship in the event there was a change in the control or stock ownership of V–A or Pilling, and (c) "there should be included a provision which would enable" V–A "to terminate the agreements if there were either a change in management or a transfer of ownership and control of" Pilling "and reciprocally there should be a provision providing for the termination of the relationship if there were a change in the control of" V–A.

9. November 9, 1965 Spartans entered into a contract with holders of 25% of the V–A stock. Its elaborate provisions reflect a comprehensive plan for Spartans to take-over V–A by acquiring, as stipulated in paragraph 8(g) of the contract, not less than 80% of all outstanding V–A stock. Subject to conditions which need not be stated, Spartans agreed to purchase all the stock of the holders of 25% of the stock, and, as shown in paragraph 1(b) of the contract, to make a public offering to buy the rest of the V–A stock. In all cases the plan contemplated that Spartans would exchange one $50 Spartans convertible subordinated debenture for 4½ V–A shares.

10. Thereafter, the holders of about 71% of the V–A stock accepted the public offering.

11. On January 26, 1966 Spartans became firmly committed to buy that stock and the stock covered by the November 9, 1965 contract and the holders of the 71% of the V–A stock as well as the holders of 25% of the V–A stock who had been parties to the November 9, 1965 contract became firmly committed to sell their stock. All conditions were for the first time satisfied or waived.

12. On the same day, that is, on January 26, 1966, Spartans sent to Pilling a notice purporting "to exercise the option to purchase the assets and business of John Pilling Shoe Company and its affiliated corporations on the terms set forth in said Paragraph XII" of the 1963 agreement.

13. January 28, 1966 through its counsel, Jacob S. Temkin, Esq., Pilling rejected the purported exercise of the option on the ground that Spartans

"have failed to comply with the provisions of said Paragraph XII."

14. February 1, 1966 Spartans acquired 96% of the shares of V–A, pursuant to the various contracts heretofore recited.

15. March 8, 1966 officers of Spartans and V–A entered into an agreement for V–A to merge into Spartans, effective March 12, 1966. Under the merger agreement the holders of the less than 10% of V–A shares not already held by Spartans were to receive payment on the same terms as had the holders of the more than 90% of V–A shares: that is, 4½ shares of V–A for one $50 Spartans convertible subordinated debenture. The directors of Spartans authorized the merger contract on the same day; the directors of V–A ratified and approved the contract on the following day.

16. March 8, 1966 Spartans sent to Pilling the following letter:

"March 8, 1966

John Pilling Shoe Company
120 Manton Avenue
Providence, Rhode Island

NOTICE OF EXERCISE OF OPTION

Dear Sirs:

The Board of Directors of Spartans Industries, Inc. (Spartans) has this day authorized the merger into Spartans of Atlantic Thrift Centers, Inc., (Atlantic), formerly known as Virginia Dare Stores Corporation. Accordingly, Spartans and Atlantic have this day entered into a contract relating to such merger.

This merger is scheduled to become effective on March 12, 1966. A conformed copy of the Certificate of Ownership reflecting the terms and conditions of the merger will be furnished after its filing.

We hereby notify you, pursuant to the provisions of Paragraph XII of an agreement made as of the 1st day of November, 1963, between Virginia Dare Stores Corporation, now known as Atlantic, and John Pilling Shoe Company, that Spartans elects to exercise the option to purchase the assets and business of John Pilling Shoe Company and its affiliated corporations on the terms and conditions set forth in Paragraph XII.

The foregoing notice is without prejudice to any and all rights which we may have under the circumstances by reason of any prior notice or your continued operations or otherwise.

Very truly yours,

SPARTANS INDUSTRIES, INC.

By     Samuel Weissman
Vice President"

17. Pilling did not reply in writing to the letter of March 8, 1966.

18. The merger became effective March 12, 1966.

19. April 12, 1966 plaintiff filed its complaint in this case.

20. In its answer filed June 28, 1966 defendant claimed that the notice of March 8, 1966 was a nullity.

The foregoing abbreviated statement of the facts is sufficient for rulings on the questions of law which arise with

respect to Paragraph XII of the 1963 agreement.

### I.

The first question is whether by virtue of its contracts to purchase and its purchase of the stock of V–A, Spartans had standing under Paragraph XII to give Pilling a notice of the exercise of an option and to exercise an option.

Literally read, Paragraph XII requires a negative answer. The paragraph is addressed to mergers, consolidations, and sales of assets. According to the second clause of Paragraph XII (b), it is "in any such case" that there is to be an option. According to the sixth sentence, it is with respect to a "Contract relating to the sale of assets or merger or consolidation" of V–A that there is to be sent notice of an exercise of option. Thus the paragraph, though it does not have express words of exclusion or set forth such words of limitation as "only", does not in express terms include a purchaser of stock.

Moreover, Paragraph IX of the agreement suggests that Paragraph XII does not apply to a purchaser of stock. Paragraph IX gives V–A the right to terminate Pilling's leases whenever Pilling makes "a sale or transfer of stock which causes or can cause a change in the management of Pilling." This express reference to a sale of stock by Pilling and the further statement that it "shall be deemed a sale of a substantial part of the assets of Pilling" justify an inference that the omission of corresponding language in Paragraph XII indicates that the later paragraph does not cover a sale of stock. *Expressio unius, exclusio alterius.* Yet this is a weak inference because there is no parallelism or reciprocity of purpose between Paragraphs IX and XII. The former gives V–A as lessor or licensor the right to terminate without payment, but only after a period of months, Pilling's leases. The latter gives a purchaser from V–A the right to terminate forthwith but only upon payment of compensation. The purpose of Paragraph IX is declared on

its face to be to protect V–A against a change in Pilling's management; whereas the purpose of Paragraph XII seems to be to permit a purchaser if it takes over V–A lock, stock, and barrel, not if it merely gains working control of V–A, to oust Pilling. Thus neither paragraph is intended to serve primarily the purpose of the lessee-licensee. The former is addressed to the concern of a lessor-licensor who shares premises and earnings with a lessee-licensee and receives rental or royalty payments based on the success of the lessee-licensee; and the latter is addressed to the concern of the lessor-licensor who seeks freedom to dispose of his property free of the license.

But there is much to be said against the foregoing considerations.

First, the opening sentence of XII(b) makes reference to "the purchaser of assets of stock" of V–A, and some meaning must be given if it is reasonably possible to the words "or stock." As is said in Muzak Corporation v. Hotel Taft Corporation, 1 N.Y. 2d 42, 46, 150 N.Y.S.2d 171, 174, 133 N.E.2d 688, 691 "The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect. 1 Restatement, Contracts, § 235, subd. (c), Fleischman v. Furgueson, 223 N.Y. 235, 119 N.E. 400; Rentways, Inc. v. O'Neill Milk & Cream Co., 308 N.Y. 342, 347, 126 N.E.2d 271, 273." It would give meaning to the words "or stock" if it is ruled that Paragraph XII applies not only to mergers, consolidations, and sales of assets but also to sales to a "purchaser of * * * stock" of V–A. This ruling would not require the exclusion of any words of limitation or restriction set forth in Paragraph XII.

Second, on its face Paragraph XII shows a purpose to give an option to a corporation taking over V–A. The purpose applies alike to a purchaser of substantially all of the V–A stock, a purchaser of substantially all the V–A assets, a merging corporation or a con-

solidating corporation. In each of those four situations the business and other objects of the take-over corporation are the same. Moreover, in each of those four situations the business and other practical effects upon the lessee are the same, particularly inasmuch as the lessee occupies the premises not of the taken-over corporation but of subsidiaries of the taken-over corporation. In mentioning three specific examples of a take-over, Paragraph XII did not specifically exclude other examples of a take-over. To construe the paragraph as embracing a fourth example of the same principle is merely to fill a "gap" in the agreement 3 Corbin, on Contracts (1960) § 534, p. 11. It makes the principle, purpose, and intent disclosed by the text of the contract applicable to a case "which was not contemplated but which should have been foreseen." Herbert Rosenthal Jewelry Corp. v. St. Paul Fire & Marine Ins. Co., 21 A.D.2d 160, 167, 249 N.Y.S.2d 208, 216.

■ Third, if the text of Paragraph XII be regarded as ambiguous because of its reference to "purchaser of stock" there is no doubt that reference may be made to extrinsic sources to determine the meaning of the quoted expression and of the paragraph as a whole. Mencher v. Weiss, 306 N.Y. 1, 114 N.E. 2d 177; Gainsboro v. Shaffer, 339 Mass. 1, 3, 157 N.E.2d 536; Corbin, on Contracts (1960) §§ 534, 535; Ibid, 1964 Pocket Parts § 543A; Williston, Contracts, 3rd ed. §§ 610, 610A. Here the preliminary negotiations of the contract disclose that the parties' purposes included all kinds of corporate take-over. Pilling's own representative, Thaler, admitted in his deposition that the purposes of Paragraph XII were to allow a purchaser which bought the V–A company to rid itself of Pilling's leases, and to prevent Pilling from blocking a sale of the V–A company to a purchaser which did not want Pilling as lessee of the shoe departments. This purpose applies to the fourth case as much as to the three specifically mentioned in Paragraph XII.

■ Under these circumstances this Court holds that a court obedient to the New York rules, which admittedly govern the interpretation and performance of the 1963 agreement, would construe Paragraph XII as conferring the same right to exercise an option upon a purchaser of substantially all the stock of V–A as upon a purchaser of substantially all the assets of V–A or a corporation into which V–A merged or with which it consolidated.

## II.

The second question is whether Spartans gave Pilling the notice required by Paragraph XII.

■ In the case of a sale of assets, or merger, or consolidation, the purchaser must give "simultaneously with the execution of the contract relating to the sale of assets or merger or consolidation" notice to Pilling. Inasmuch as a sale of stock is *in consimili casu* with those three situations, the purchaser of stock must give Pilling notice simultaneously with the execution of the contract relating to the sale of stock.

■ In the case at bar, there were several contracts relating to the sale of stock. On November 9, 1965 Spartans entered into a contract with holders of 25% of the V–A stock. The contract included an agreement by Spartans, subject to certain conditions, to purchase the stock of the holders of the 25% of the V–A stock, and to make a public offering to buy the rest of the V–A stock. Later, pursuant to the public offering, Spartans made contracts with others who held over 70% of the V–A stock. But unquestionably Spartans' contract of November 9, 1965 was *a* contract *"relating"* to the sale of substantially all of V–A's stock. It was one of *the* basic contracts so related. As such it fell within the requirement of Paragraph XII as "the contract" of which, simultaneously with its execution, Spartans, if it wished to exercise the option provided in Paragraph XII, was required to give notice to Pilling. It made no difference whether the con-

tract was subject to conditions precedent or subsequent, whether later it was altered by waiver or otherwise, whether by itself it covered all the stock necessary to complete the take-over of V–A, or whether Spartans could not know until months had elapsed if pursuant to the contract there would be a delivery to it of any V–A shares. Regardless of all those and other uncertainties and possibilities, the contract was so closely related to the sale of the V–A shares necessary to give Spartans a standing under Paragraph XII, and was such an indispensable part of the series of contracts constituting the take-over of V–A, that it constituted the contract or one of the contracts which came within the purpose of the notice provisions of Paragraph XII. Those notice provisions were intended to alert Pilling as soon as possible to the risk that it was in imminent danger of being bought out.

Spartans did not simultaneously with the execution of the November 9, 1965 contract give notice to Pilling of Spartans' "intention to exercise the option granted" under Paragraph XII. It follows that Spartans' purchase of substantially all the shares of V–A is by itself not a basis for the exercise of an option granted under that paragraph.

### III.

There is no doubt that pursuant to an agreement signed by officers of Spartans and V–A on March 8, 1966, fully ratified on March 9, and executed on March 12, V–A was merged into Spartans.

As a merging purchaser Spartans had standing under Paragraph XII to give Pilling a notice of the exercise of an option and to exercise the option.

Spartans sent such a notice on March 8, 1966. Pilling contends that Spartans should have waited until ratification of the merger agreement on March 9. There is no merit to the point. Notice a day too early is not a defective notice under Paragraph XII. Pilling was better off, not injured, by such promptness.

But Spartans never followed up its notice of March 8 with any further formal action until it filed on April 12, 1966 a complaint in this case. Spartans alleges that it was excused from taking further action because there was nothing for it to do under the unworkable conditions of Paragraph XII This allegation raises the difficult question whether the option created by Paragraph XII is capable of being exercised according to the letter of the 1963 agreement, and if not, whether Spartans took appropriate action to justify a court in construing Paragraph XII to permit Spartans and Pilling to render substitute performances of the option procedure and if so, what substitutes; and if the agreement is not performable according to its letter or some substituted procedure, whether the agreement is voidable.

There are circumstances in which clearly it would be impossible to exercise the option according to the letter of the agreement. The procedure stipulated in Paragraph XII is impossible of *total* performance where a merger takes place in the last half of the month. In such circumstances the paragraph requires that balance sheets as of the date of the merger be available on that very date so that the accountant can deliver to the parties on that same date a computation of what the purchaser owes and so that the purchaser can make payment on that date. Common experience, confirmed by the uncontradicted affidavit of Berdon's partner, Yellin, teaches that in the case of a large corporation a balance sheet as of a date certain cannot be struck until some days have passed and all transactions up to and including that date have been reported to and analyzed by the accountant.

However, there is no evidence that the procedure stipulated in Paragraph XII is impossible of total performance if a merger occurs say on the fifteenth of the month pursuant to a contract made a fortnight earlier. In such circumstances the accountant may use the balance sheets of the end of the preceding month. It has not been proven that

in an emergency V–A and Pilling could not have all entries made sufficiently promptly so that a diligent accountant working overtime could not make the determination required by Paragraph XII.

But this Court does not rest its decision *solely* on the absence of such proof. The Court will assume that the procedure stipulated in Paragraph XII would never be completely workable and, in any event, would not be completely workable with respect to a merger effective on the twelfth of the month pursuant to a contract ratified only three days earlier.

Upon that assumption the Court would be faced with the questions whether Spartans took appropriate action to justify a court in construing Paragraph XII to permit the parties to render substitute performances of the option procedure, and if so, what substitute performances might be permitted. These questions will be approached in inverse order.

The procedure established by Paragraph XII had four purposes: (1) that a purchaser of V–A should have the right when it took over V–A to terminate the Pilling licenses and direct Pilling to quit the premises forthwith, (2) that the accountant should value the worth of Pilling and of V–A as of the date of the take-over of V–A or at the end of the month nearest thereto, and should determine the exact consideration the purchaser was to pay Pilling, (3) that on the day of the merger the purchaser should tender the exact payment due under the accountant's determination, and (4) that then Pilling should transfer all its assets as of the day of the merger to the purchaser.

We have already assumed that, because it takes time to prepare balance sheets and to make a determination, the third purpose cannot be accomplished. But there are substitute procedures which could accomplish the other three purposes and could come close to accomplishing the third purpose.

One obvious example would be a procedure under which (1) the purchaser at the time the merger becomes effective directs the accountant Berdon to proceed forthwith to value V–A's net worth as of the date of merger, (2) the purchaser simultaneously requests Pilling (pursuant to the third sentence of Paragraph XII which contemplates that the "Balance Sheet of Pilling shall be prepared by David Berdon & Co. for Pilling at its expense") to authorize Berdon to value Pilling's net worth as of the date of merger, (3) the accountant promptly makes his determination and submits it to Spartans and V–A, (4) Spartans tenders the necessary debentures, and (5) Pilling simultaneously transfers its assets then existing, even though they would be different in quantity, kind, and value from Pilling's assets on the merger date, and (6) pursuant to determinations made by the accountant, the parties make adjustments later to reflect the difference in the value of the Pilling assets as of the merger date and as of the date of exchange of Spartans debentures for Pilling assets and also the difference in value of the debentures on those two dates.

We may indulgently assume that under the law of New York, a court, invoked on or before the date of the merger, would have reformed or construed the 1963 contract to permit such a substitute procedure. This would be an application of the principle set forth in 6 Corbin, on Contracts § 1326 that where there is an impossibility of performing a small and non-essential part of a contract, as where the specified mode of attaining a result cannot be performed, the court may sanction another and reasonable mode.

But, although it was fully aware before the merger of the alleged impossibility of totally complying with the letter of Paragraph XII, Spartans waited until April 12, 1966, five weeks after the merger, before it invoked the jurisdiction of any court and even then it did not pray for instant judicial action, such as a temporary mandatory injunction. Moreover, Spartans never at any time directed Berdon to proceed to value

as of the merger date V–A's net worth. or requested Pilling to cause Berdon to value Pilling's net worth, or made any tender to Pilling of debentures or a surety bond guaranteeing performance. In the meantime, months have passed and the assets and liabilities of Pilling are very different in quantity, kind, and value from what they were on the day of the merger. The debentures may also be different in value.

Of course, it would be possible for a court even now to reform or construe the 1963 contract so that the assets to be transferred by Pilling shall be those in existence as of some date in 1967 or later. But this would be a situation not merely a few weeks but many months different from the one the parties contemplated.

Except upon a showing, which has not been made in this case, that Spartans did all that it could to perform Paragraph XII according to its letter, including giving prompt notice to the accountant and to Pilling that it wanted valuations and determinations made as of the merger date, a court should not now construe Paragraph XII to permit of an exchange of debentures and of assets a year or so later than contemplated. This is not by any means a merely technical point. Not only have there been fluctuations in the assets and liabilities of Pilling, and not only is the business situation in 1967 not the same as in March or April 1966, but it is not clear that Spartans by either market purchases or by a new issue of debentures could have produced in March or April 1966 the number of debentures which would have been required then if Berdon had made a prompt determination. Absent some explanation for Spartans' failure to seek construction of Paragraph XII before it effectuated the merger, there seems some color to Pilling's contention, buttressed by the evidence, that the reason Spartans delayed was because it would have been impossible for Spartans to procure the necessary debentures within a short time after the merger.

In short, this Court concludes that Spartans is barred from exercising an option under Paragraph XII on the two grounds, relied upon separately as well as cumulatively, that (1) Spartans failed to follow the procedure stipulated by Paragraph XII which is not proved to have been impossible of fulfillment, and (2) Spartans failed to do what it could have done before or at the time the merger became effective to comply with the procedure specified in Paragraph XII and to get immediate judicial assistance in construing the paragraph to permit substitute procedures to go into effect as soon as possible.

IV.

Spartans finally contends that this Court should declare that inasmuch as Paragraph XII could not be performed according to its letter in any circumstances, and especially not in the circumstances of a merger authorized on March 8, 1966 and effectuated on March 12, 1966, the 1963 agreement is completely frustrated and is at an end for all purposes.

That contention cannot prevail. First, Spartans has not proved that under all circumstances Paragraph XII was incapable of performance. Second, even if the option provisions of Paragraph XII were incapable of performance they were not so central to the 1963 agreement as to make the whole agreement voidable. Third, were the Court to declare that the agreement was voidable the effect would be that Pilling would be required to leave the premises forthwith and without compensation. Such drastic consequences would be inequitable and would do violence to the disclosed purposes of the contract. In this connection it is worth noting that Paragraph IX authorizes a termination to become effective only after months have elapsed; and Paragraph XII authorizes a termination only if Pilling's assets are bought at their value as part of a going concern.

In accordance with the foregoing conclusions there shall be entered a decree

making appropriate and necessary declarations of Spartans' failure to comply with Paragraph XII of the 1963 agreement and dismissing Spartans' prayers for specific performance and for damages.