**SPARTANS INDUSTRIES, INC.,**
**Plaintiff, Appellant,**

v.

**JOHN PILLING SHOE COMPANY,**
**Defendant, Appellee.**

**No. 6893.**

United States Court of Appeals
First Circuit.

July 18, 1967.

Robert W. Meserve, Boston, Mass., with whom Nutter, McClennen & Fish, Boston, Mass., and Parker, Chapin & Flattau, New York City, were on brief, for appellant.

Jacob S. Temkin, Providence, R. I., with whom Samuel A. Olevson, Providence, R. I., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

In November 1963 a corporation then known as Virginia Dare Stores Corporation (which we will hereafter call, in spite of a subsequent change of name, Virginia Dare) entered into an agreement with defendant John Pilling Shoe Company. Virginia Dare operated chain stores, and Pilling ran shoe departments in the stores as a lessee-concessionaire.

Paragraph XII of the agreement reads as follows.

XII. In the event that during the term of this Agreement:

(a) Virgina Dare shall merge into or be consolidated with another corporation; or

(b) *Virginia Dare shall sell all or substantially all of its assets as a going concern;* then, and in any such case, Pilling agrees that the merging or consolidating corporation or *the purchaser of assets or stock of Virginia Dare (hereinafter for convenience called the "Purchaser")* shall have the option to purchase the assets and business of the affiliated corporations of Pilling and Pilling agrees to sell such assets and business on the terms hereinafter set forth. The option of the Purchaser shall relate to the purchase of the assets subject only to the liabilities as shown on the *Consolidated Balance Sheet of Pilling as of the date of closing (or at the end of the month nearest thereto) of the transaction between Virginia Dare and the Purchaser.* Such Balance Sheet of Pilling shall be prepared by David Berdon & Co. for Pilling at its expense. The purchase price to be paid by the Purchaser to Pilling shall be on the same basis whether stock, cash or other securities as is received by *Virginia Dare or its stockholders* with respect to its net worth as compared to the net worth of Pilling as shown by the Balance Sheet prepared by David Berdon & Co., as aforesaid. David Berdon & Co. shall likewise compute the manner in which the consideration received by *Virginia Dare or its stockholders* from the Purchaser shall be applied to the net worth of Pilling in order to ascertain the consideration to be paid by the Purchaser to Pilling and their determination shall be final and binding upon the parties hereto. Simultaneously with the execution of the Contract relating to the sale of assets or merger or consolidation of Virginia Dare, the Purchaser shall notify Pilling in writing at Pilling's address as stated above, of its intention to exercise the option granted under this

Paragraph and in the event that such option is exercised, as herein provided, such Purchaser shall simultaneously with the closing make payment to Pilling of the consideration required to be paid to Pilling by virtue of the exercise of this option and Pilling shall at such closing execute and deliver to the Purchaser all documents that counsel for the Purchaser may reasonably require in order to legally vest in the Purchaser good and marketable title of the assets, subject to the liabilities shown in the Balance Sheet prepared by David Berdon & Co. as aforesaid, subject only to the changes occurring in the normal and regular course of business subsequent thereto. [Italics supplied.]

We shall hereafter refer to this paragraph as the Agreement.[1]

Twice in 1966 plaintiff, Spartans Industries, Inc., asserted that it was a Purchaser within the meaning of the Agreement and sought to exercise the option there provided. Upon Pilling's second refusal Spartans brought the present diversity action for a declaratory judgment, specific performance and damages. Concededly New York law governs. The district court dismissed the complaint and Spartans appeals.

Two different transactions were asserted to have given rise to the option. The first originated with an agreement between Spartans and twenty-five per cent of Virginia Dare's stockholders, dated November 9, 1965, under which Spartans agreed to make a public bid for the balance of Virginia Dare's outstanding stock on certain specified terms, and to purchase such stock and the agreed twenty-five per cent if Spartans could thereby acquire at least eighty per cent of the total stock outstanding and certain other conditions were met. On

January 26, 1966, the objectives having been achieved, Spartans and the stockholders became bound to complete the sale. On the same day, Spartans notified Pilling and purported to exercise the option. Pilling refused. The district court upheld this refusal on the ground that "the Contract relating to the sale * * *" (line 34) was the contract of November 9, 1965 and that Spartans had not given Pilling the simultaneous notice called for by the Agreement (lines 33–38).

We agree with the district court that Spartans did not become entitled to exercise the option as the result of its January 26 demand, but for a more basic reason. As we read the Agreement, a Purchaser who obtained an option was one who contracted directly with Virginia Dare, and not one who acquired stock on the open market.

Subparagraph (a) of the Agreement (lines 3–4), not presently relevant, relates to a direct engagement with Virginia Dare. Subparagraph (b) does also, at least at the outset (lines 5–6), since it refers to Virginia Dare, only, as the seller. This concept is clearly reinforced when the Agreement makes "the date of closing * * * of the transaction between Virginia Dare and the Purchaser" (lines 16–18) determinative with regard to computing the price to Pilling.

It was the view of the district court that because the Agreement elsewhere refers to the "purchaser of assets *or stock* of Virginia Dare" (lines 8–9, italics ours), Pilling, in spite of the provisions we have quoted, must be taken to have recognized as an optionee any purchaser of "all or substantially all" of Virginia Dare's stock whoever the seller, and irrespective of the number of contracts [2] and the absence of any

---

1. The balance of the elaborate contract of lease is summarized in the opinion of the district court, 263 F.Supp. 191, 193–195.

2. We note, without further comment, that the Agreement speaks in terms of *"the* Contract relating to the sale * * *" (line 34, italics ours), a matter which gave the court some difficulty in considering the date when notification to Pilling was required. We note, also, the statement in Spartans' brief, made in another connection, but perhaps apposite, "The agreement simply did not contemplate a situation where, as here, [Virginia Dare] stock would be purchased pursuant to a number of contracts."

transaction between Virginia Dare and the purchaser. It reached this conclusion primarily by applying the principle that no part of a contract is to be regarded as surplusage if it can be otherwise construed, the court considering that the phrase "purchaser of assets *or stock*" (italics ours) in line 8 could not be given meaning unless recognition were given to purchasing stock.[3] 263 F.Supp. at 197. The principle is right enough, but the court lost sight of the fact that Virginia Dare might in some manner redeem "all or substantially all" its stock and sell it directly to the Purchaser, or might assemble and sell the stock as agent for its shareholders. In such circumstances there would be no surplusage. The court's implication of a right to obtain an option by acquiring stock from other sellers not only read in more than necessary, but created an inconsistency with other provisions in the Agreement. Moreover, a matter on which we need not dwell, very possibly it threatened Pilling and Virginia Dare with a new option whenever Virginia Dare's stock changed hands.

Nor was there any practical necessity for extending the Agreement to encompass transactions with other sellers. Anyone who bought "all or substantially all" of Virginia Dare's stock on the market could arrange to merge or be consolidated with it and thereby acquire standing to exercise the option.

We turn, accordingly, to the other portion of the case.

On March 8, 1966 Spartans, having acquired over ninety per cent of that corporation's stock, contracted to merge with Virginia Dare. The merger was to be consummated on March 12. Spartans duly and simultaneously notified Pilling of the contract, and stated that it exercised the option provided by the Agreement in case of merger.[4] However, although the Agreement specified that the closing with Pilling should be simultaneous with the closing of the transaction with Virginia Dare (lines 38–46), and that payments should be made contemporaneously (line 40), Spartans did not attempt to put itself in a position to make payment on March 12. It neither issued nor acquired the necessary convertible debentures, nor instructed (if it was its duty, rather than Pilling's to do so) the accountant, David Berdon & Co., to ascertain the consolidated balance sheet figures from which the amount of the debenture payment was to be determined.

■■ Spartans offers as a major reason or excuse for this failure to attempt performance on March 12 Pilling's oral rejection on March 11,[5] but this is a diversion. A rejection may excuse tender of performance, Rockland-Rockport Lime Co. v. Leary, 1911, 203 N.Y. 469, 483–484, 97 N.E. 43, L.R.A.1916F, 352; Scholle v. Cuban-Venezuelan Oil Voting

3. The court, properly, did not rely on the fact that in two other places (lines 23–24, 28–29), the Agreement spoke of payments to "Virginia Dare *or its stockholders*" (italics ours). This language was obviously applicable to mergers quite apart from direct sales of stock.

4. We do not accept Pilling's *volte face* from an otherwise determined insistence upon the literal terms of the Agreement, by its attempt to qualify the word "merger" with an implied proviso, "except when the Purchaser already owns all or substantially all of the stock." Pilling argues that if such an exception is not implied, the Purchaser might, without injury to itself, absorb Virginia Dare on very unfavorable terms to Virginia Dare. This,

in turn, since the merger price determines the option formula, would lead to an unfair price to Pilling. The short answer to this is that the Agreement contains no qualifications on who votes to merge. Nor is there any suggestion that any overreaching was sought here. We cannot believe that if a purchaser sought to perpetrate a fraud on Pilling the courts would be helpless to rectify it.

5. We are unimpressed with Pilling's argument that the affidavit of Spartans' witness that Pilling refused on March 11 is not to be accepted. The argument is over-labored, and flies in the face of the joint stipulation. We note, further, that Pilling makes not counter suggestion that it indicated any willingness to accept.

Trust, 2 Cir., 1960, 285 F.2d 318, but it does not excuse inability to perform, Strasbourger v. Leerburger, 1922, 233 N.Y. 55, 134 N.E. 834; Bigler v. Morgan, 1879, 77 N.Y. 312; Scholle v. Cuban-Venezuelan Oil Voting Trust, supra, except to the extent that such inability is due to the conduct of the recalcitrant party, see, e. g., Cohen v. Kranz, 1963, 12 N.Y.2d 242, 238 N.Y.S.2d 928, 189 N.E.2d 473. The briefs of both parties flatly maintain—and we find no reason to question them—that performance on March 12 could not have been possible, regardless of Pilling's response or co-operation. Under these circumstances, Pilling's rejection on March 11 cannot advance Spartans' case.

In this posture Spartans asserts that that the impossibility was due to apparent deficiencies in the Agreement, and that these should be overlooked or rectified by the court. This contention falls into two parts. The primary one is that the Agreement was so ill-conceived that there never could be any performance in exact accordance with its terms. The argument goes as follows. The Agreement sets the amount of the payment in terms of assets and "liabilities as shown on the Consolidated Balance Sheet of Pilling as of the date of closing (or at the end of the month nearest thereto) of the transaction between Virginia Dare and the the Purchaser" (lines 15–18). Payment, as we have said, is to be made on the date of closing. We may readily agree that a balance sheet could not possibly be struck as of the day of the closing on the day of the closing so that the requisite payment could be made simultaneously. Spartans goes further, and claims that it could not even be struck in the fifteen day maximum term of the Agreement. For present purposes we may assume that fifteen days, too, would be insufficient. However, we do not agree that fifteen days was the longest period permitted.

Spartans contends that if the closing came after the fifteenth of the month, "the end of the month nearest thereto" was the last day of that particular month. Hence, it says, if the closing occurred in the second half of the month, either the balance sheet would have to be struck the date of closing, which is concededly impossible, or at the end of the month of the closing, making payment on the date of the closing even more obviously impossible. Hence, Spartans says, its only choice was to contract for a closing date in the first half of the month, which would allow it a maximum of fifteen days between the date for the balance sheet and the closing.

■ The district court accepted this construction. However, we do not believe the Agreement was so poorly drafted as to set a possible balance sheet date after the date when payment was to be made. Rather, we believe the Agreement was wrongly interpreted. We construe "the end of the month nearest thereto" as referring to "month nearest," not "end * * * nearest," viz., the month immediately preceding the closing. If the closing was to be on April 18, for example, "the end of the month nearest thereto" is March 31, not April 30. Our construction is not only possible, but sensible when read with the main tenor of an agreement clearly contemplating payment on the closing date. It is elementary that a construction which comports with the Agreement as a whole is to be preferred even if it be thought that certain language, viewed only by itself, more readily suggests something else.

Whatever persuasiveness there may be to the claim that fifteen days' leeway would not be enough, Spartans has in no way shown that if a closing date near the end of the month had been selected a balance sheet could not have been made available as of the end of the month preceding. Under these circumstances, since the facts do not fit it, we need not consider Spartans' legal contention that "indisputabl[e] * * * impossibility of performance without

interpretation of the Agreement" requires reformation, or what the district court termed substitute performance. Spartans' case must stand or fall upon the validity of its alternative contention, that since in this particular instance performance could not have been possible on the date of the closing of the transaction between Virginia Dare and the Purchaser the court should construe the Agreement to require some later performance.

To this Pilling responds that its rights were not to be given the Procrustean treatment; the obligation was on Spartans to meet the terms of the Agreement and itself produce the proper accommodation. There is some ready plausibility to this. Since after January 1966 Spartans, by its ownership of over ninety per cent of Virginia Dare's stock, had complete control, the inference seems inescapable that it was only its convenience that caused it to set March 12, rather than some later date, as the date of the closing. Spartans, in other words, could have set up a schedule under which the Agreement could have been precisely performed. It must follow that Spartans is now seeking to rely upon an impossibility of its own making. However, there is another side to the coin. It may be asked how Pilling is prejudiced if it is made to perform at a date different from the one called for by the Agreement if Spartans, unilaterally, had full power to set, within the Agreement, that same later date.

Pilling maintains that with respect to "acceptance of options [t]ime is always of the essence," without, it may be observed, citing any New York authority. In point of fact the New York cases show some reluctance to hold time to be of the essence in both option and other contracts. E. g., Jones v. Gianferante, 1953, 305 N.Y. 135, 111 N.E.2d 419; Ballen v. Potter, 1929, 251 N.Y. 224, 167 N.E. 424; Day v. Hunt, 1889, 112 N.Y. 191, 19 N.E. 414; see Allen v. Biltmore Tissue Corp., 1957, 2 N.Y.2d 534, 161 N.Y.S.2d 418, 141 N.E.2d 812, 61 A.L.R.2d 1309; Trustees of Columbia University, etc. v. Kalvin, 1929, 250 N.Y. 469, 166 N.E. 169, 63 A.L.R. 1151; Holden v. Efficient Craftsman Corp., 1923, 234 N.Y. 437, 138 N.E. 85.

■ Even were time thought to be of the essence with respect to the exercise of the option, it does not follow that time is of the essence for performance of the bilateral contract of purchase and sale that results from its exercise. Willmott v. Giarraputo, 1959, 5 N.Y.2d 250, 184 N.Y.S.2d 97, 157 N.E.2d 282 (dictum); Horgan v. Russell, 1913, 24 N.D. 490, 140 N.W. 99, 43 L.R.A.,N.S., 1150; 1A Corbin, Contracts (1963) 597–601. In the absence of an express provision, the inquiry should be to the prejudice which might result from delay. See Jones v. Gianferante, supra. Here it appears minimal. Under the circumstances we believe the New York courts would distinguish the usual option to enter a commercial relationship from one, such as we have here, to break it off on fair terms. Cf. Trustees of Columbia University, etc. v. Kalvin, supra; Foelsch v. Eaton, 7 A.D.2d 730, 180 N.Y.S.2d 757 (App.Div.1958). It makes sense for distrustful parties to agree that each must perform punctiliously, or the whole deal is off. It makes little sense to hold that the least delay in payment by Spartans condemns it forever to a relationship which the parties had agreed might be severed.

■ The district court found against Spartans not because it considered time of performance to be of the essence, but because, in its opinion, Spartans delayed more than necessary; specifically that it waited "five weeks after the merger" before instituting suit. 263 F.Supp. at 200. Assuming that excessive delay would block Spartans' rights, and passing the perhaps quibbling point that from March 12 to April 12 was not five weeks and that some interval should be allowed for preparation of a complaint, for even five

weeks to be too long a wait to start a lawsuit would require the most extraordinary circumstances. None such is indicated in the case at bar. Moreover, we find it difficult to conceive of any prejudice that Pilling might have suffered from Spartans' relatively short delay.[6] The court's reference to possible detriment based on a closing date "not merely a few weeks but many months different from the one the parties contemplated," 263 F.Supp. at 201, not only overlooked the fact that in a larger sense Pilling contemplated no date at all, since under the Agreement Virginia Dare and its Purchaser determined the date, but involved a misconception. The court's "many months" plainly referred to the termination of the lawsuit. However, a defendant cannot, by resisting a valid lawsuit, claim that the delay resulting caused a change of position which afforded him rights.[7] We must hold that Pilling had no valid ground for refusing to perform.

Pilling's other defenses have been considered, but found not to require comment.[8] We will not attempt to answer certain questions sought to be raised anticipatorily by the parties except to say that both balance sheets required for the price calculation should now be struck as of March 12, 1966.

The judgment of the district court is reversed and the action remanded for further proceedings.

---

6. In fact, between March 12 and April 12 Spartans had two conferences with Pilling to see if the matter could be settled. For this we would be more disposed to commend it than to censure; nor is there any evidence that Pilling protested that it would rather be sued than talked with. We need not, however, reach the question whether Pilling was estopped to claim laches by this conduct. Cf. Bergeron v. Mansour, 1 Cir., 1945, 152 F.2d 27; LaBonte v. New York, N.H., and H. R.R., 1960, 341 Mass. 127, 167 N.E.2d 629.

7. We are reminded of the old saw of the defendant who killed his father and mother and asked for leniency because he was an orphan.

8. The court's suggestion—not amounting to a finding of fact—that if Pilling had indicated a willingness to perform Spartans could not have issued or obtained the necessary convertible debentures in a reasonable time, we believe, having in mind its demonstrated assets and considerable liquidity, to be unfounded.