OPINION OF THE COURT
Martin Evans, J.
Plaintiffs here move for summary judgment in this action for a declaratory judgment. The action seeks a declaration that a certain option is void, as being allegedly violative of the Rule against Perpetuities (the Rule) as adopted by the Legislature (by the Assembly on June 21, 1965 and by the Senate on June 22,1965, now EPTL 9-1.1, subd [b]).
*498 The underlying facts are not unduly complex. However, they are important both to the parties, and to the public at large, since the requested judgment would not only have the effect of declaring void a particular option in favor of the defendant, but would, by parity of reasoning, result in the avoidance of an identically worded option, involving four railroad tunnels under the East River which are used by the Metropolitan Transportation Authority (MTA) for the operations of the Long Island Railroad. Also, on the basis of a claim of failure of consideration, the judgment might give rise to a claim to set aside, or otherwise affect, the agreement made in 1965 whereby the State of New York, through the Metropolitan Commuter Transportation Authority (now the MTA) purchased the Long Island Railroad from the Pennsylvania Railroad Company (Pennsylvania).
Earlier in 1965, after a Special Committee had recommended the purchase of the Long Island Railroad, the State of New York appointed Dr. William J. Ronan and William A. Shea, Esq., to negotiate with the Pennsylvania Railroad Company for the purchase of the Long Island Railroad.
On June 9,1965 Dr. Ronan and Mr. Shea reported to the Governor and to the legislative leaders the results of their negotiations, and submitted to them the memorandum of understanding, which was dated June 9, 1965.
The report set forth the practical necessity of the acquisition of the property through a negotiated contract, rather than by a condemnation proceeding, particularly because of the Long Island Railroad’s continuing need to use the four tunnels under the East River and the Pennsylvania Station. The Long Island Railroad was to obtain their use, as a gateway to midtown Manhattan, through a 99-year lease, at a reasonable annual rent. The report further stated that the Long Island Railroad was to have an option to purchase the four tunnels if Pennsylvania no longer needed them for its operations. The report indicated that the air rights over the Long Island City freight yards were to be conveyed by the Long Island Railroad to Pennsylvania, which would reduce the purchase price and permit unified air rights development with other areas whose *499 ownership Pennsylvania was retaining, in what is known as the Sunny side yards.
The memorandum of understanding (which was later followed by a contract executed on December 22,1965) was signed on behalf of the State of New York by the representatives of the Governor, the representative of the legislative majority leadership, and by appropriáte officers of Pennsylvania. It provided for a purchase price of $65,000,000. It also provided, inter alia, in paragraph 3(b), for the transfer of the air rights over certain property of the Long Island Railroad, together with easements over the land below, and provided, in paragraph 4, that “At such time as New York determines that all or any part of the real property underlying the air rights referred to in paragraph 3(b) above is no longer necessary for New York transportation operations, Pennsylvania (or a subsidiary) shall have the option to purchase all or any part of the property so determined to be unnecessary at the fair market value thereof.”
The memorandum of understanding, in paragraph 6, provided for a 99-year lease to the Long Island Railroad of the tunnels and of Pennsylvania Station, and of related facilities. It gave the Long Island Railroad the right to terminate the lease on five years’ notice.
Paragraph 7 of the memorandum of understanding gave two options to New York State, each relating to two of the four tunnels under the East River. Paragraph 7(a), relating to the two tunnels whose operations were to be leased to the Long Island Railroad and shared in operation by both Pennsylvania and the Long Island Railroad, stated: “At such time as Pennsylvania determines that either or both of the two East River Tunnels now occupied by Railroad are no longer necessary for said operations by Pennsylvania (or its subsidiary) New York shall have the option to purchase either or both of such tunnels determined to be unnecessary at the fair market value thereof.”
The second option, in paragraph 7(b), related to the two tunnels which were not then to be leased to the Long Island Railroad, but which were used solely by Pennsylvania. It stated “If Pennsylvania determines that either or both of the two East River Tunnels now occupied by Pennsylvania *500 are no longer needed for railroad purposes by Pennsylvania and Pennsylvania determines to sell, or to offer such tunnels for sale, New York shall have the option to purchase either or both of such tunnels determined to be unnecessary at the fair market value thereof.”
Of the nine paragraphs of the memorandum of understanding, these options comprised 2 paragraphs.
On June 23,1965 the Legislature approved the purchase of the Long Island Railroad on the basis of the terms and conditions set forth in the memorandum of understanding, by appropriation of the $65,000,000 on that date to effectuate the purchase. (See the Supplemental Budget, L 1965, ch 442, § 19, p 1317.)
On December 22,1965 the agreement between the MTA and Pennsylvania Railroad was executed. On that date the Governor of the State of New York made a public statement. (See 1965 Public Papers of Governor Nelson A. Rockefeller, p 1396, in which, on behalf of the State, he announced his approval of the contract.)
Under the contract, the closing was set for January 20, 1966, and on that date the various documents which are here involved were executed and delivered.
A deed of the air rights, commencing at a level 22 feet above the railroad tracks, and over 12 specified lots of land, was granted to Delbay Realty Corporation, a subsidiary of Pennsylvania. The deed also granted to Delbay an easement[1] to construct and maintain columns, footings, foundations, drains, utility and service lines and stairways on the land itself so long as these did not interfere with the operations of the Long Island Railroad, and the railroad agreed to move its structures and facilities, at Delbay’s *501 expense, if that was necessary to the enjoyment of the easement.
The option agreement granted to Delbay the option heretofore referred to, for a period of 99 years. The option was to be effective, as to each of the separate lots, only when MTA decided that it no longer needed that lot.
The affidavits of Edwin K. Taylor, Esq., and Harry McNally, both of whom aver that they were among the group of representatives of Pennsylvania who negotiated the sale, state that it was anticipated that the condition precedent to the exercise of the option, namely, the determination by MTA that it did not need the particular lots for transportation purposes, would be made within a few years because it was the intention of both Pennsylvania and the Long Island Railroad to phase out the freight operations at that location.
If Delbay decided to exercise the option, it was required to notify MTA within 90 days from the date that it received notice from MTA. The price was to be the “fair market value” of the land, and was to be fixed by arbitration before the American Arbitration Association.
On April 16, 1982, MTA advised Delbay that MTA no longer needed six of the lots, all of which were located in various blocks as shown on section 1 of the Tax Map of the Borough of Queens. MTA, in its letter to Delbay, stated, in pertinent part: “As a result of our Board’s determination, the Delbay Corporation may now exercise its option rights on those parcels, identified in the attached Resolution. Should Delbay wish to exercise its option, then notice must be delivered to the LIRR/MTA not more than ninety (90) days after receipt of this notice, setting forth all or a specified portion of the property described in the Board’s Resolution”.
On July 6, 1982 Delbay assigned that part of its option relating to two of the six lots to Bruken Realty Corp. and, on July 12, 1982 notified MTA of the assignment. On July 13, 1982 Bruken Realty Corp. notified the MTA that it elected to purchase the two lots in accordance with the option agreement.
There followed some oral discussions between MTA and Bruken relating to the procedure to be used to determine *502 the fair market value of the property, and a written agreement, memorializing the changes to the procedures that had been set forth in the original agreement was executed by MTA and Bruken, under date of August 12, 1982. In substance, the parties provided that they would attempt to have the fair market value determined by agreement of their respective appraisers, no later than October 15,1982; and agreed that they would only resort to the arbitration procedures defined by the original agreement if the appraisers were unable to agree. This agreement also stated that: “9. Except as expressly modified herein the terms of the Option Agreement are unmodified and in full force and effect.”
The appraisers could not agree, and on or about November 9, 1982, Bruken, in accordance with the provisions of the agreement between it and MTA, demanded arbitration. No motion to stay arbitration was made by MTA, and the selection of the arbitrators was completed in March, 1983. On March 23,1983 the parties were notified as to the identity of the arbitrators and dates were set for the arbitration.[2]
However, on April 12,1983 MTA commenced this action, seeking a declaration that the original option agreement was void under the New York Rule against Perpetuities which was adopted the day before the legislative approval, through the budget process, of the memorandum of understanding.
The defendants, in addition to some general denials, have interposed certain defenses; and Bruken has also interposed seven counterclaims, for specific performance, damages, and for a reformation of the option contract so as to fix its time limit at 21 years.
The first defense of Bruken actually incorporates 10 separate theories. The most important of those, which will be discussed herein, allege, in substance:
*503 1. The option is not the usual option, which gives the holder the right to demand a conveyance of the land whenever it wishes, but is merely a right of first refusal, or preemption, to which the Rule does not apply.
2. EPTL 9-1.1 (subd [b]) was not intended by the Legislature to apply to the agreement between MTA and Pennsylvania, or to the option agreement which was part of the main agreement.
3. The rules of construction in EPTL 9-1.3 (subd [d]) permit a construction of the option so as to validate it if in fact it violates the Rule which requires vesting within 21 years.
4. A new contract was made between MTA and Bruken as of August 12, 1982 for the purchase and sale of the two lots, and this contract is not governed by the Rule.
Since the claim of the plaintiff is based on EPTL 9-1.1 (subd [b]), a brief history of that legislation, insofar as it affects this case, is pertinent.
Originally placed, in section 43 of the Real Property Law (L 1965, ch 670) the section was passed by the Assembly on June 21,1965 and by the Senate on June 22,1965, and was signed by the Governor on July 2, 1965. By its terms, it became effective on September 1, 1965. (See NY Legis Record & Index, 1965, p 556.)
In pertinent part, section 43 of the Real Property Law provided as follows: “Time in which an estate in property must vest. No estate in property shall be valid unless it must vest not later than twenty-one years after one or more lives in being at the creation of the estate and any period of gestation involved.”
Although options which gave the optionee the absolute right to purchase property owned by another, without limitation as to time, had been allowed in New York (Matter of City of New York [Upper N. Y. Bay], 246 NY 1) it has recently been held that the Legislature intended an option in gross (as opposed to an option appurtenant to a valid interest) to be subject to the Rule requiring an early vesting of the estate in property. This was decided in Buffalo Seminary v McCarthy (86 AD2d 435, affd for the reasons stated in parts I and II but not part III of the App Div opn, in 58 NY2d 867).
*504 In Buffalo Seminary v McCarthy (supra), an option to purchase all, or any part of a 20-foot strip of land was given to the plaintiff. The option was unlimited as to time. The price was to be set at the market value, which was to be determined by appraisers. The agreement prevented the defendants from placing any structures or improvements on the land during the existence of the option. The option could have been terminated by the defendants only if defendants received a bona fide offer for the purchase of their entire premises, either including or excluding the 20-foot strip of land.
EPTL 9-1.1 (subd [b]) was intended to adopt the American common-law rule against remoteness in vesting, and was to apply to options. (Buffalo Seminary v McCarthy, supra, p 442.) This is in accord with the statement by the sponsor of that legislation. “The underlying objective of the rule has always been to protect the alienability (that is, transfer) of property. This it did by prohibiting both provisions suspending the power of alienation and provisions involving remoteness of vesting in such manner as to fetter the fact of alienability * * * the bill merely codifies the full common law rule. (Report No. 5.2A, Leg. Doc. No. 19, 1965.)” (NY Legis Ann, 1965, pp 206-207.)
The option here, however, is of a different type than the option which was present in Buffalo Seminary (supra). It does not give the option holder the right to demand the property at any time chosen by the optionee. Even though it is called an “option” it merely gives the optionee what is, in effect, a preemption, or right of first refusal. Whether or not this type of option is within the prescriptive rules of EPTL 9-1.1 (subd [b]) must be the subject of further analysis.
The contract provides that “the option herein granted shall be exercisable as to the Property or any part thereof only at such time or times as Metropolitan Commuter Transportation Authority * * * or its successors shall determine that the whole or any part of the property is no longer necessary for the transportation operations of Authority” and plaintiff argues that the condition which gives rise to the option is not the desire of MTA to sell (which it may not wish to do) but a different condition, and that this makes the option an ordinary option and not a preemption.
*505 But it seems to this court that the condition is in reality a condition based on the desire of MTA to dispose of the property, since the raison d’etre for the existence of MTA is transportation and when the property is no longer needed, sale or other disposition would be necessary. As Mr. Justice Marbach stated, in Kowalsky v Familia (71 Misc 2d 287, 290): “Such subtle distinctions lack reality.”
If there is any ambiguity as to the meaning of the condition, in the light of the other documents in the case, that must be resolved at a trial.
I
A.
While it is clear that an unconditional option, exercisable solely at the will of the option holder, is an estate in property and made subject to the Rule against remoteness in vesting (Buffalo Seminary v McCarthy, 86 AD2d 435, supra), there is no definitive holding in New York that a right of preemption, which does not arise until the landowner decides to sell, is either an estate in property, or that it is subject to the Rule against remoteness in vesting.
On analysis, it appears to be more in the nature of a contractual right which may arise in the future, conditioned upon the happening of an event not within the control of the optionee, but exercisable only when the owner decides to sell. In effect, it gives the seller the possibility of an additional buyer. It is more in the nature of an expectancy, such as might arise on the exercise of a power (see Simes & Smith, The Law of Future Interests [2d ed, 1956], §§ 224, 311, 421), or a contract right. Plaintiff itself, refers to the option as a “subjective expectancy” which “is not an interest in property protected by due process.” (See the commonsense discussion in Robroy Land Co. v Prather, 95 Wn 2d 66.) Some courts have held it to be an estate on condition subsequent (Dozier v Troy Drive-in-Theatres, 265 Ala 93). Others have held that the right of preemption exists only during the relatively short time in which it may be exercised. (Tramontano v Catalano, 23 AD2d 894; see, also, Leach, Perpetuities in a Nutshell, 51 Harv L Rev 638, 660, where Professor Leach, in discussing the application of the Rule to contracts observed that *506 contract rights ought not to be subject to the Rule, citing Worthing Corp. v Heather, 2 LR Ch D 532 [1906].) The English court in Worthing, although holding that an option could not be specifically enforced as violative of the Rule against Perpetuities, nevertheless allowed the maintenance of an action for damages for the breach of contract.
However, even if such a right is considered to be an estate in property, first options or rights of preemption have long been known to, and upheld in, the common law of New York.
As long ago as Jackson ex dem. Lewis v Schutz (18 Johns 174), a preemptive right to purchase, without limitation of time, and binding on the grantor and his heirs and assigns and in favor of the grantee, his heirs and assigns was held to be valid. (See Van Rensselaer v Jones, 2 Barb 643, 671 [dicta: reasoning of Jackson approved].)
In 1850, it was held that a reservation of what was then known as a “sixth sale” (i.e., the right in the grantor to recover a percentage of the sale price upon any subsequent sale) was invalid. (Overbagh v Patrie, 8 Barb 28, affd 6 NY 510.) The Overbagh court specifically disagreed with the view expressed by Platt, J., in Jackson ex dem. Lewis v Schutz (supra) that a reservation of a “tenth sale” was valid, but nevertheless agreed with the reasoning of Spencer, J., in Jackson ex dem. Lewis v Schutz by stating (8 Barb, at p 34): “No doubt has been entertained of the correctness of the judgment rendered in that case, because the condition giving the right of pre-emption was lawful.”
In De Peyster v Michael (6 NY 467), the court held that a preemptive right to purchase, with a deduction of one fourth of the price asked by the seller, was void by reason of the tendency of the one-fourth deduction to restrain the alienation of the property.[3] The court, however, adverting to Jackson ex dem. Lewis v Schütz (supra), said: “that the plaintiff, in that case, was entitled to recover on the breach of the condition in relation to preemption was not questioned, and it seems to be entirely clear.” (6 NY, at p 491.)
*507 In Garcia v Callender (125 NY 307), the Court of Appeals held that the preemption clause in a deed, unlimited as to time, could not be exercised because the owner of the property had not chosen to sell the property. The court, by so deciding, sub silentio recognized the general validity of the right of preemption.
More recently, in Tramontano v Catalano (23 AD2d 894, supra) and Matter of Abbondondolo (10 Misc 2d 418) preemptive rights of the nature involved in this case were held to be valid.
Thus, the common-law rule in New York before the adoption of section 43 of the Real Property Law (now EPTL 9-1.1, subd [b]) was that rights of preemption were valid provided that they were reasonable and did not fetter, regardless of remoteness, the transferability of property. (See, also, Allen v Biltmore Tissue Corp., 2 NY2d 534.)
There is no single common-law rule or uniformity in approach, among other American jurisdictions. As examples, Connecticut has held that preemptions are within the Rule. (Neustadt v Pearce, 145 Conn 403, following Lewis Oyster Co. v West, 93 Conn 518.)
Several other States, however, have held preemptions to be valid. (See, e.g., Windiate v Leland, 246 Mich 659; Anderson v Riegel, 229 Wis 200; Weber v Texas Co., 83 F2d 807, cert den 299 US 561; see, also, 40 ALR2d 919, and cases cited therein.)
Scholars, too, have questioned whether a right of preemption should be subject to the Rule. “Is a right of preemption also subject to the Rule? It can be argued that where the price [of land] at which the option can be exercised fluctuates with the value of the land, including improvements, the existence of the option cannot inhibit optimum use of the land and the building of any desired structures; therefore it would seem, such an option does not violate the policy of the Rule.” (6 American Law of Property [1952 ed], 1962 Supp, p 27.) The authors conclude, despite the Connecticut case to the contrary (cf. Neustadt v Pearce, supra), that rights of preemption should be upheld. (See, also, 13 U of Fla L Rev 214.) The authors further doubt whether there is any public or societal purpose in including a preemption within the Rule. (6 American Law of Property [1952 ed], pp 141-144.)
*508 Moreover, preemptive rights, either to renew or to purchase the property, when included within a lease, have never been included within the Rule, since the existence of such rights encourages the development of property. (See 6 American Law of Property [1952 ed], § 24.57, p 145.)
In Weber v Texas Co. (supra), the appellant contended that since the royalty eighth was owned by the lessor as realty, since the lease extended to the heirs and assigns of the lessee and continued in force “as long as either oil or gas is or can be produced from any well on said land”, and since the option was coextensive with the length of the lease, the option had a prospective operation beyond the time limit fixed by the Rule against Perpetuities, and was therefore void.
The court said (supra, p 808),
“The rule against perpetuities springs from considerations of public policy. The underlying reason for and purpose of the rule is to avoid fettering real property with future interests dependent upon contingencies unduly remote which isolate the property and exclude it from commerce and development for long periods of time, thus working an indirect restraint upon alienation, which is regarded at common-law as a public evil * * *
“The option under consideration is within neither the purpose of nor the reason for the rule. This is not an exclusive option to the lessee to buy at a fixed price * * * at some remote time beyond the limit of the rule against perpetuities, meanwhile forestalling alienation. The option simply gives the lessee the prior right to take the lessor’s royalty interest at the same price, the lessor could secure from another purchaser whenever the lessor desires to sell. It amounts to no more than a continuing and preferred right to buy at the market price whenever the lessor desires to sell. This does not restrain free alienation by the lessor. He may sell at any time, but must afford the lessee the prior right to buy. The lessee cannot prevent a sale. His sole right is to accept or reject as a preferred purchaser when the lessor is ready to sell. The option is therefore not objectionable as a perpetuity.”
For the same reasons of public policy, rights of first refusal to purchase property, if exercisable either on terms *509 similar to the terms offered by a third party, or at a fair market price, have been held not to restrain the alienation of property and not to violate the Rule against Perpetuities.
In Matter of Abbondondolo (10 Misc 2d 418,419, supra) a condition attached to a devise was “ ‘That in the event that either wishes to sell his share to the said premises, the other shall have the right to purchase the same at the market price of similar property located in that immediate vicinity. If they do not wish to exercise this right, then my other children shall have the right to purchase the same at the market price of similar property located in that vicinity.’ ”
The court held that the option was valid. Citing Chaplin, Suspension of the Power of Alienation ([3d ed], § 397), the court stated (Matter of Abbondondolo, supra, p 421): “ ‘The giving of ordinary short term options to persons in being, does not involve any of the forms of “mischief” which our statutes sought to eliminate. They were not intended to uproot this convenient and harmless practice.’ ”
Rowlee v Dietrich (88 AD2d 751) is instructive. Rowlee was decided by the same court that decided Buffalo Seminary (86 AD2d 435, supra) and it was decided on the same day, May 14, 1982. It referred to the Buffalo Seminary decision.
In Rowlee, a right of first refusal was given to plaintiffs, to purchase certain premises at a fixed price of $6,500. The option was to inure to the benefit of the heirs and assigns of the optionees, and was binding on the heirs, etc., of the grantors of the option. (Rowlee v Dietrich, supra, p 751.)
Defendants argued that the option must fail because it was for an indefinite duration and that it had not been exercised within a reasonable time, although the court noted that defendants did not assert that the option violated EPTL 9-1.1 (subd [b]).
The court denied summary judgment to defendants, holding that the right of preemption was prima facie valid, and that the defendants had the burden, at a trial, of proving the unreasonableness of the option.
Thus the logic and force of Lord Chancellor Nottingham’s reasoning in the Duke of Norfolk’s Case (3 Ch Cas *510 1, affd 3 Ch Cas 53) has sent its resonances throughout the centuries.
Establishing what was then called the rule of “inconvenience” and which now may be called the rule of reasonableness in deciding whether a particular type of limitation unduly fettered the free alienability of property, he said, “You may limit, it seems, upon a contingency to happen in a life; what if it be limited, if such a one die without issue within twenty-one years, or one hundred years, or while Westminster Hall stands? Where will you stop if you do not stop here? I will tell you where I will stop. I will stop whenever any visible inconvenience doth appear; for the just bounds of a fee simple upon a fee simple are not yet determined, but the first inconvenience that ariseth upon it will regulate it.”
The test of reasonableness, or inconvenience to society thus created, has continued in one form and another and has been applied by all courts which have seriously considered the matter. (See Allen v Biltmore Tissue Corp., 2 NY2d 534, supra; Rowlee v Dietrich, supra.)[4]
The option at bar was apparently necessitated by the then existing commercial transaction and was designed to reunite the land below with the air rights in order to give each greater value and use. It was reasonable when created and is reasonable in its present condition. It nowhere prevents the sale or disposition of the land; in fact, by obtaining a potential purchaser, sale is encouraged. The statute was neither designed, nor considered by the Legislature to prevent this commonly accepted method of contracting, and the option is therefore not voided by the operation of EPTL 9-1.1 (subd [b]).
B.
It also seems clear that the Legislature, in adopting the Rule, and the Governor, in signing the bill creating the Rule, did not intend it to apply to the present transaction.
*511 MTA argues that the memorandum of understanding, which referred to the option, did not set forth the possible duration of 99 years, and concludes that neither the Legislature nor the Governor were aware of this when they approved the memorandum by providing for its fulfillment by appropriating the required $65,000,000. However, the Governor, who announced his approval of the completed contract on December 22, 1965, approximately six months after his having signed the bill, by his act of approval, demonstrated his understanding that the contract, and the options included, were valid.
This thoroughly sui generis agreement was intended by the State as the least expensive alternative to solve the serious transportation problem then faced by the State. Condemnation and consequent compensation of this railroad with its “specialty” items of trackage, cars, lines and tunnels at a value which might be required by a court might be, according to the report of Dr. Ronan and Mr. Shea, improvident and fiscally impractical. The agreement and the Rule were never envisioned as being in conflict, since each was intended to satisfy a very different purpose.
The mechanical application of general rules which were neither intended nor expected to be automatically used without regard to the unique circumstances of a given case, should be approached with caution and rejected unless a sound reason for their use appears.
A case strikingly similar to the instant one is Southeastern Pa. Transp. Auth. v Philadelphia Transp. Co. (decided in the Ct of Common Pleas, County of Philadelphia, on July 14, 1966, affd 426 Pa 377, cert den 390 US 1011). There, in a well-reasoned opinion, an option, indefinite in time, to purchase the entire property of the defendant was held to be valid. The court, analyzing the authorities, said, “the controlling question in deciding whether to apply the rule to a future interest outside the field of family estate is, ‘Will application of the rule serve the purpose for which the rule was invented?’ ”
It was held that since the reasons for the Rule did not exist in that case, the Rule against Perpetuities was not applicable.
*512 II
Defendants urge that the preemption, even if it is otherwise barred by EPTL 9-1.1 (subd [b]), is nevertheless made valid through the application of the rules of construction set forth in EPTL 9-1.3 (subd [d]). That section provides as follows:
“(a) Unless a contrary intention appears, the rules of construction provided in this section govern with respect to any matter affecting the rule against perpetuities * * *
“(d) Where the duration or vesting of an estate is contingent upon the probate of a will, the appointment of a fiduciary, the location of a distributee, the payment of debts, the sale of assets, the settlement of an estate, the determination of questions relating to an estate or transfer tax or the occurrence of any specified contingency, it shall be presumed that the creator of such estate intended such contingency to occur, if at all, within twenty-one years from the effective date of the instrument creating such estate.”
The words “specified contingency” were substituted by the Legislature for the prior wording, “like contingency” to avoid the effect of cases such as Matter of Nathanson (27 Misc 2d 340) where the contingency specified by the testator was the ultimate date for the payment of certain mortgages, and Matter of Connor (37 Misc 2d 363, 364) where payment was to be made “if and when the enterprises * * * are sold or liquidated”. In each of those cases, the courts had held the disposition to be invalid, as violative of the rule against remoteness of vesting.
To allow up to 21 years for the occurrence of whatever contingency was specified, not limited to administrative contingencies, and to overturn the rule set forth in those cases, the Legislature removed the words “like contingency” and adopted the words “specified contingency”. See Patrick J. Rohan’s Practice Commentary (McKinney’s Cons Laws of NY, Book 17B, Pocket Part 1983-1984, EPTL 9-1.3, p 194) where it is stated: “Thus, for example, it would cover a contingency such as The return of the A.B.C. Corporation to New York City as its principal place of business’.”
*513 But see Matter of Shaul (58 Misc 2d 967), which without discussion, did not adopt that reasoning, and limited the words “specified contingency” to the administrative contingencies earlier set forth in the statute.
It is apparent from the wording of the option agreement that the parties intended, or expected, that the various parcels of land subject to the agreement would be available for sale at different times. That the parties contemplated the existence of plural, separate options to be exercised or rejected at different times, appears from the wording of the contract.
Paragraph 1 of the option agreement refers to the exercise of the option “at such time or times” as the property is determined to be no longer necessary for transportation purposes.
Paragraph 2 refers to the price, which is to be the fair market value, at the time of the notice sent by MTA.
Paragraph 3, referring to the separate exercise of each option, states “The option shall be exercised in each case by written notice” and continues by stating, in the plural, “In any event, all options available hereunder which have not theretofore been exercised shall expire ninety-nine years from the date of the instrument. Upon exercise of any option hereunder” and the paragraph ends with the sentence, “The purchase price in each case shall be all cash and that part of the property obligated to be conveyed at the time in question shall be conveyed by quit claim deed.”
Thus the duration of the contract was contemplated to be no longer than 99 years, but the contingency giving rise to the possibility of the exercise of each option, with its consequent vesting in possession, was contemplated to occur from time to time before the end of the 99-year period.
The agreement must be analyzed in light of the plain statement in EPTL 9-1.3 (subd [d]) that “it shall be presumed that the creator of such estate intended such contingency to occur, if at all, within twenty-one years from the effective date of the instrument creating such estate.”
Plaintiff essentially reasons that the court should read the contract as if the term of 99 years was the term at *514 which the parties expected the option to be exercised, but that is not what the contract states. The statute was designed to save these rights wherever possible, not to defeat them. To accept that argument would defeat the expressed intention of the parties, which was that the contingency on which each option could be exercised would arise at various times, but that if it arose after 99 years the contractual rights would have expired.
As was stated in Friedman v State of New York (242 App Div 314, 317), “We may not presume that the parties to this agreement, made in the very presence of the State Athletic Commission, intended to enter into a contract for the doing of something which was unlawful * * * ‘The presumption is in favor of the legality of contracts. The law does not assume an intention to violate the law, nor will an agreement be adjudged to be illegal, where it is capable of a construction which will uphold it, and make it valid.’ (Lorillard v. Clyde, 86 N. Y. 384.)”
Ill
The actions of MTA, Delbay and Bruken, commencing in April, 1982, created a new contract for the conveyance of the land, not subject to the Rule against Perpetuities.
On April 16,1982 MTA advised Delbay that Delbay had the right to exercise its option, as to certain parcels of the land provided that it did so within 90 days. On July 13, Bruken, as assignee of Delbay, notified MTA of its election to purchase the two lots. Even if the option had previously been unenforceable against MTA, this was tantamount to the making of a new offer by MTA, to be accepted within 90 days. Upon Bruken’s timely acceptance in writing, a contract was made. Although the price was not agreed upon, the manner of determining the price had been established.
Even if the argument of plaintiff, that the preemption option was a future estate created in December, 1965 and “invalid” under EPTL 9-1.1 (subd [b]), were true, there is no rule of law which prohibited MTA from offering an option to Delbay in 1982, upon the terms previously set forth in the agreement, or from preventing the ripening of a contract by Bruken’s timely acceptance of that offer.
Thus, as of July 13, an enforceable contract had been created.
*515 Thereafter, by agreement dated August 12, 1982, the contract created on July 13 was modified, to provide for the use of appraisers as a first, and possibly the final step in the determination of the price. This created a new contract, which is presently in existence. (Carrier v Carrier, 226 NY 114; Becker v Faber, 280 NY 146; Beacon Term. Corp. v Chemprene, Inc., 75 AD2d 350.)
For the above reasons, the motion by plaintiff for summary judgment is denied.

. It seems clear to this court that the easements transferred with the air rights effectively limited the use of the land only to railroad use, and that the use of the land for any other purpose would have been effectively prevented by the right of the air rights owner to place columns, foundations, etc., on the land so long as these did not interfere with the operations of the railroad, and the underlying railroad facilities were required to be moved if that were necessary to the enjoyment of the easement.
Thus, when the land was no longer required for railroad use, the easement almost completely fettered the alienability or other use of the land. And, by reason of the cost of these necessary structures, the air rights by themselves do not appear to be economically useful. Only when both were joined could there be reasonable use of them.
Similarly, the air rights, which started at a level some 22 feet above the level of the tracks, and which would require expensive foundations for their utilization, had little value unless they could be used in conjunction with the land.

. Bruken, in the meantime, had begun the process of raising moneys and of incurring expenses to prepare for the payment to MTA. It alleges that it had spent more than $300,000, and that investors had contributed, through a registered limited partnership, more than $1,200,000 in February, 1983. It had, in September, 1982, begun the process of negotiation with the City of New York (which in the interim period had acquired the air rights by reason of tax defaults of Delbay) to acquire the air rights over the property.

. That the objection of the courts, and of the public, was only to quarter or sixth sales, or the like, can be seen in the article I of the Constitution of 1846, which, responding to the problems created by that type of restriction, adopted section 15, which voided any such reservations in the future. It was there provided that “All fines, quarter sales or other like restraints upon alienation, reserved in any grant of land hereafter to be made, shall be void.” There were no similar restrictions, however, on preemptions.

. Whether the separation of the air rights from the land by the 1965 transfer, which had the effect of fettering the use and alienability of the land (see n 1, supra) would be held valid is not before the court. If so, presumably the parties to the Buffalo Seminary case (86 AD2d 435) could have achieved their objective of keeping the 20-foot strip of land fallow for any extended period of time by selling the air rights over it.
Exactly what air rights are, and whether they are, or should be, freely transferable as separate from the land, are important questions, but irrelevant here. “It is ancient doctrine that at common law ownership of the land extended to the periphery of the universe — Cujus est solum ejus est usque ad coelum. But that doctrine has no place in the modern world.” (United States v Causby, 328 US 256, 260-261.)